A93A0928, A93A0929. AMERICAN HONDA MOTOR COMPANY, INC. v. WILLIAMS & ASSOCIATES, INC. et al.; and vice versa.
(431 SE2d 437)

BIRDSONG, Presiding Judge.

Case No. A93A0928 is an appeal by appellant/defendant American Honda Motor Company, Inc. (Honda) of the order of the superior court granting motion for partial summary judgment on Counts 4, 5, 6, 7 and 8 and certain portions of Count 3 of the amended counterclaim of Honda to appellees/plaintiffs, Williams & Associates, Inc. et al. (Williams). Honda also appeals Section 1 of the order of the superior court which denied Honda's motion for partial summary judgment on the issue of responsibility for soil testing. Case No. A93A0929 is a cross-appeal by appellee Williams of Section 1 of the order of the superior court which denied summary judgment to it on the issue of responsibility for soil testing.

Williams entered into a construction contract with Honda to perform certain construction of a Honda distribution and training center

(project), including site preparation; Williams subcontracted the site preparation work to At-Less Construction Company. This contract did not include the laying of the concrete slab for the warehouse, which apparently was done by Suitt Construction Company pursuant to the terms of a separate contract. Honda contracted with Heery & Heery Architects and Engineers, Inc. (Heery) to provide design and construction management services for the project. Honda also contracted with Soil & Material Engineers, Inc. (S & ME) to provide geotechnical consulting and to perform certain soil tests on the project during design and construction thereof; S & ME agreed to perform tests necessary to determine whether soil on site was "suitable" or "satisfactory" in accordance with contract definitions. In April 1984, At-Less filed suit against Williams, Heery, and Honda apparently after the fill dirt that had been asserted as being satisfactory under the contract could not be dried for timely use on the project. Williams filed cross-claims against Honda and Heery relating to problems encountered by Williams and At-Less as to surcharge soil materials. (Surcharge soil is placed temporarily on fill dirt to aid soil compacting.) When this litigation was initiated the project was not complete and Williams continued to work thereon for approximately another year. The project design required excavation of large quantities of soil from one area and extensive structural fill of other areas on which buildings were to be erected. The contract specified that only satisfactory fill was to be used and it established classification standards for determining whether soil was deemed satisfactory. The contract required certain tests to be performed on any soil which was proposed to be used as structural fill; during the course of discovery it was learned that such tests had not been performed as required. There is no dispute that S & ME was the entity which was to perform the tests on the fill material; however, Honda contends that a substantial dispute exists as to whose responsibility it was to initiate the testing procedure and who had ultimate responsibility to see that the tests had been carried out. Honda claims Williams had this and other responsibilities; Williams contends it was the responsibility of Heery and/or S & ME to determine what soil was to be tested and when, and that it had no contractual obligation to initiate such testing. This dispute led to the filing of cross-motions by the parties for partial summary judgment on the issue of responsibility for soil testing. The trial court denied both motions. *Held*:

## Case No. A93A0928

1. Appellant Honda's first, third, fourth, fifth, and sixth enumerations violate OCGA § 5-6-40, which pertinently provides that each enumeration of error "shall set out separately each error relied upon."

When such a violation occurs, this court may elect to review any or none of the errors which were asserted in a single enumeration. See, e.g., *Parsons v. Chatham County Bd. of Commrs.*, 204 Ga. App. 130, 132 (3b) (418 SE2d 459); *Morris v. State Farm Mut. Auto. Ins. Co.*, 203 Ga. App. 839, 841 (b) (418 SE2d 119); *Robinson v. State*, 200 Ga. App. 515, 518 (2) (408 SE2d 820); *West v. Nodvin*, 196 Ga. App. 825, 830 (4c) (397 SE2d 567); see Ga. Const. of 1983, Art. VI, Sec. I, Par. IV. In the exercise of our judicial discretion, we elect to review as to each of the above enumerations only the error, repetitively asserted in each, that the court erred in holding Williams had no independent duty to disclose the information known to it, with respect to the soil conditions, other than those described by Civil Practice Act § 9-11-26 (b) (4).

2. The following facts are pertinent to the issue of Williams' duty to disclose information as to unsatisfactory soil conditions on the project. Honda in essence contends that Williams had a duty to disclose information as to the unsatisfactory classification of the soil, according to contract standards, used as structural fill underneath the eastern side of the warehouse building. That work appears to have been performed in July and August of 1983, under the daily observation and apparent inspection of Honda's testing service, S & ME and Heery. S & ME and Heery approved that work as having been performed in accordance with contract specifications and Williams and At-Less received payment for that work.

In the summer of 1984, after litigation had commenced, a geotechnical expert from Georgia Tech was hired by the litigation counsel for Williams to analyze the surcharge soils with which a problem had been encountered. The condition of the surcharge soils apparently was then at issue in the pending litigation, it being contested whether such soils were "satisfactory" or "unsatisfactory" for use under the contract. If the surcharge soils were "satisfactory" then with proper drying they would be available for use as structural fill in the project without necessitating Williams and At-Less to transport satisfactory fill dirt from other locations.

On July 5, 1984, the geotechnical expert reported to Williams' counsel and other Williams' representatives that four samples had been taken from the surcharge soil material and tested. He concluded that each of these samples should have been classified as "unsatisfactory" under the contract, and that there was a relationship between surcharge soil which was unsatisfactory and the drying problems that had been encountered. However, the expert also stated that, as he had not witnessed the taking of the samples, he could not be sure they were representative of the surcharge soil and more samples would have to be taken and tested, although he harbored a question whether the surcharge was suitable.

On July 7, 1984, additional samples were taken in the presence of a Williams employee, including four samples of soils taken from an area where soil material previously had been cut or excavated and may have been used as surcharge, and one sample from an excavated ditch in an area where fill material was thought to have been removed and near where the warehouse was being constructed. Tests were conducted on these additional samples and another meeting was held on July 26, 1984, with the attorneys, the same employee and Mr. Williams. No written report of the test was obtained but the expert had obtained test result information by telephone. At this meeting the expert noted that in the S & ME report of March 13, 1983, it had been stated that an Atterberg Limits test had been performed on the site soil material — this is the type of test necessary to determine whether the soil was satisfactory under the contract specifications. The expert further explained that a building could be built on unsatisfactory soil, as defined in the contract specification, if properly designed for that soil. The president of Williams was unaware of the specific locations of the individual samples taken by the expert or the specific logic for the selection of these particular samples, and this was not discussed at the meeting. At this meeting the expert advised that a soil scientist should be employed to identify the types of soil and the vertical and horizontal extent of those soils in their original in situ state before excavation in order, inter alia, to determine the extent of the unsatisfactory soil material on site. Of the 21 soil samples taken and tested, 19 of them tested unsatisfactory according to the expert's analysis. However, Honda's agents had previously reported the surcharge soil as satisfactory, and Mr. Williams expressly stated: "As of July 26, 1984, I and everyone else at Williams to my knowledge had absolutely no awareness of the fact that the surcharge soil had not been tested and classified by [S & ME]" and he did not understand why the expert's description of the test results indicated the surcharge to be unsatisfactory. Williams received a written report of the expert's findings in late December 1984, after the foundation of the warehouse had been completed; this report was delayed due to the expert's diagnosis of having cancer in August 1984. The report explained that six of the samples in question were "thought to be" representative of fill placed under the eastern part of the warehouse, and that one of these tested "satisfactory" and the others "unsatisfactory." By the time of this report, Williams had substantially completed all of its work on the job at the Honda site, and without question all of the concrete slab placement had been completed by Suitt Construction Company in all of the building areas. Ultimately the expert's physical condition improved temporarily and he was identified as a contemplated trial witness and deposed by the other parties. Thereafter, the expert suffered a relapse and died.

In August 1984, a soil scientist was hired as a litigation consultant, as recommended, to conduct further investigation and testing. At the time the expert's written report was received in December 1984, Williams had received neither an oral nor written report from the soil scientist, and he had received no records in discovery showing which Atterberg Limits tests might have been performed or upon what soil it had been performed and when. The report of the soil scientist was received by Williams in June 1985.

The record in regard to disclosure of the above information reveals that, as found by the trial judge, the preliminary information and opinions developed by the geotechnical expert/litigation consultant were not disclosed to Honda in the summer of 1984; rather, the expert's identity, test results, and final report and opinions were disclosed to Honda and the other parties in November and December 1985 in the course of the litigation in accordance with the provisions of OCGA § 9-11-26 (b) (4). The record also supports the trial court's finding that S & ME did not conduct tests (as required by its contract with Honda) on the surcharge soil material or on any other soil materials used in the site work as controlled fill.

The counterclaims at issue in Honda's motion for partial summary judgment were based on Williams' refusal to disclose its litigation consultant/expert and that expert's opinion prior to the expert being named a trial witness. The trial court concluded that Williams "fully complied with the requirements of Rule 26 (b) (4)" by disclosing the expert's name to Honda at the time Williams determined that the expert's opinions would be used during trial; it further concluded that "the contract provisions relied upon by [Honda] do not provide a contractual obligation that [Williams] disclose facts and opinions developed by a litigation expert." "The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." OCGA § 23-2-53. There exists no confidential relationship between Honda and Williams, and even when the evidence is viewed most favorably for Honda, we find, as a matter of law, no particular circumstances operating to mandate such a communication between the parties. The parties contracted on virtually equal terms and at arms-length, and in fact Honda elected to employ S & ME to perform soil testing, thereby electing not to rely on Williams for soil testing and classification. These facts, when construed most favorably for Honda, nevertheless reveal the intent of the parties, OCGA § 13-2-3, that Honda would not and could not either expect or rely upon any form of communication regarding soil classification from Williams.

The trial court could construe the contract as a matter of law and ascertain whether it required such communication (cf. *Travelers Ins. Co. v. Blakey*, 255 Ga. 699, 700 (342 SE2d 308)), and we agree with

her legal conclusions pertaining thereto. The provisions of the contract relied upon by Honda do not expressly require Williams to disclose any information regarding the results of the particular soil tests which it independently obtained after litigation had been commenced, or to disclose the name of any expert which it employed to advise it in regard to these matters; nor does the contract when viewed as a whole reveal such to be the parties' intention. *Tower Financial Svcs. v. Jarrett*, 199 Ga. App. 248 (404 SE2d 622); *Clay v. Dept. of Transp.*, 198 Ga. App. 155 (400 SE2d 684); *Graham v. Hogan*, 185 Ga. App. 842 (366 SE2d 219) and *Capriulo v. Bankers Life Co.*, 178 Ga. App. 635 (344 SE2d 430), cited by Honda, are factually distinguishable and not controlling.

Appellant also argues there exists an implied duty in every construction contract to perform the work skillfully, carefully, and in a workmanlike manner (see, e.g., *Shaw v. Petersen*, 180 Ga. App. 823 (350 SE2d 831); *Mayor &c. v. Clark-Dietz &c.*, 550 FSupp. 610, 624 (9) (ND Miss.)). While we do not take issue with this legal proposition, it is not controlling and dispositive of the question whether Williams had a duty of disclosure under the unique facts of this case. Honda, particularly through its election to rely on the independent services of an architect and a soil testing firm, was in an equal or better position than Williams to test the soil being used as fill dirt and to determine whether it met contractual standards. "While concealment of material facts may amount to fraud when the concealment is of intrinsic qualities the other party could not discover in the exercise of ordinary care [cit.], in an *arms-length business or contractual relationship* [as existed between Honda and Williams] there is no obligation to disclose information which [as in this case] is equally available to both parties." *Southern Intermodal &c. v. Smith &c. Co.*, 190 Ga. App. 584, 586 (1) (379 SE2d 612); compare *Pinkerton &c. Co. v. Roadway Exp.*, 650 FSupp. 1138, 1147 (12) (N.D. Ga.). It is not contested that Williams violated CPA Rule 26 (b) (4) as to the ultimate disclosure of this information; accordingly, we find that the trial court did not err.

Additionally, Mr. Williams states by way of affidavit that "to this day, I do not know *for certain* that the soil underneath the warehouse or other buildings is 'unsatisfactory,' since to my knowledge there have been no direct coring or sampling of the soil underneath the warehouse or the other buildings so that they can be tested and classified as satisfactory or unsatisfactory." (Emphasis supplied.) The vice-president of Williams stated in his affidavit that it never occurred to him to communicate the test data developed by their litigation expert to appellants, and that Williams had already requested that Honda and Heery classify the surcharge soil as "unsatisfactory," to authorize its removal from the job site and authorize the importing

of new soil as contractual "extras" and that Honda, Heery, and S & ME "had steadfastly refused to do this, taking the exact opposite position that the surcharge soil materials had been tested and were satisfactory." The vice-president further stated: "It never occurred to me that any of the surcharge soil or the fill soil in the warehouse or any of the other building locations . . . might have been unsatisfactory soil, until long after all of the work on the job site had been completed by Williams & Associates, Inc. and until long after all of the concrete slab and suspended slab work had been done in all of these areas. Again, this did not occur to me until after the deposition of Mr. Wilmer in December, 1987, which made it clear that [S & ME] had not conducted soil tests necessary to classify any of the soil used as fill as satisfactory or unsatisfactory according to the contract specifications." Conversely, appellant relies upon circumstantial evidence to establish that Williams had actual knowledge, prior to the time Williams' expert's name was released in discovery and his deposition subsequently taken, that the fill soil under the warehouse and buildings was unsatisfactory. "We have consistently held that in passing upon a motion for summary judgment, a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." (Punctuation omitted.) *Rowell v. McCue*, 188 Ga. App. 528, 531 (373 SE2d 243). For this additional reason, we find the trial court did not err as to the issue of duty to disclose; a grant of summary judgment must be affirmed if it is right for any reason. *Newsome v. Dept. of Human Resources*, 199 Ga. App. 419, 423 (3) (405 SE2d 61).

3. Appellant Honda asserts the trial court erred in granting partial summary judgment as to the entirety of Count 3 of its amended counterclaim grounded in negligence. We disagree. Williams had no duty to notify Honda of soil conditions as averred in Count 3. See Division 2 above. The only remaining act of negligence averred in Count 3 with sufficient specificity to meet the liberal pleading requirements of the Civil Practice Act, as discussed in *Bazemore v. Burnet*, 117 Ga. App. 849, 852 (161 SE2d 924), is that Williams negligently failed to ascertain that the soil was satisfactory before placing it as fill beneath the eastern end of the warehouse. This particular averment of negligence is grounded upon acts or omissions which, while constituting the violation of a particular contractual duty, would not otherwise constitute the violation of a duty owed to Honda independent of the contract itself. "[A] contractual violation is a tort only if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of contract to avoid harming him." (Punctuation omitted.) *Bowdish v. Johns Creek Assoc.*, 200 Ga. App. 93, 95 (3) (406 SE2d 502); accord *Sheppard v. Yara Eng. Corp.*,

248 Ga. 147 (281 SE2d 586); see *Keys v. Enrichment Svcs. Program,* 183 Ga. App. 8 (357 SE2d 852) (independent injury over and above duty created by contract required for tort).

4. Appellant Honda's seventh enumeration of error in Case No. A93A0928 will be considered with cross-appellant Williams' enumeration of error in Case No. A93A0929 below.

Appellant's remaining assertions are meritless.

### Case No. A93A0929

5. Cross-appellant/appellee Williams asserts the trial court erred in failing to grant its motion for summary judgment against Honda on the issue of responsibility for soil testing; cross-appellee/appellant similarly asserted as error in Case No. A93A0928 that the trial court erred in failing to grant its motion for partial summary judgment against Williams on responsibility for such testing. The record reflects that Williams did not file a formal motion for partial summary judgment on the responsibility for testing issue; however, it urged in its response to Honda's motion that it be granted summary judgment on this issue. Compare *Howell Mill-Collier Assoc. v. Pennypacker's,* 194 Ga. App. 169 (1) (390 SE2d 257) (authority to grant summary judgment to nonmoving party). Both enumerations lack merit. Pretermitting whether cross-appellant adequately preserved his enumeration for appellate review, by failing to file a formal motion and obtaining a ruling thereon below, is that cross-appellee/appellant adequately raised and preserved for appeal the question whether the trial court correctly ruled that the responsibility for soil testing (or the initiation of soil testing) under the contract was a jury issue.

Honda and Heery argued, inter alia, to the trial court that since Williams was required to use only satisfactory soil, as that term is defined by the contract, Williams also had the responsibility to initiate the soil tests, as it was the only party who knew when the tests were needed and of what soil. Williams argued that the contract did not expressly place such a burden on it, and that the conduct of Honda and the presence of S & ME on the job site belied such a contractual intent. The trial court expressly noted in its order that "in addition to differing interpretations of the meaning of the contract language, all parties contend that the acts and conduct of the parties on the job site support their respective interpretations of the contract." The trial court examined the contract language and found that in regard to the issue of "who was responsible for the administrative task of scheduling or the initiation of the testing" that the contract was ambiguous; and that the contract ambiguity could not be resolved "even after applying the rules of construction," and that the parties' intention remains uncertain.

The cardinal rule of contract construction is to ascertain the intention of the parties thereto. OCGA § 13-2-3. We agree that, as to the issue of who was administratively responsible for the initiation of soil testing, the contract is ambiguous to such a degree that the question of the parties' intent in this regard cannot be ascertained as a matter of law by applying usual statutory rules of contract construction. Further, the course of conduct and actions of the various parties at the job site is not without certain factual controversy; and where unresolved ambiguity exists, " '[t]he construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them.' " *Head v. Scanlin*, 258 Ga. 212, 214 (1) (367 SE2d 546), citing *Scruggs v. Purvis*, 218 Ga. 40, 42 (126 SE2d 208). The trial court in this case attempted to follow the two-step procedure of *Travelers Ins. Co.*, supra, and was unable to resolve the ambiguity and to ascertain the true intent of the parties as to the issue of initiation of soil testing. It then elected to send this matter to the jury. Where complex, contested fact-issues essential to determining either the contractual intent of the parties or obscure and contradictory contract provisions are involved, the jury should find the facts. Id. at 700. Thus, it was held in *Travelers Ins. Co.*, supra at 700, that "[e]xcept in cases where the meaning of obscurely written words is involved, and where there is evidence tending to show that the meaning of such words was differently understood in one way or another by the parties to the contract it is . . . improper for the court to give the jury any instruction with regard to the manner in which the contract should be construed." However, we agree with the trial court that this is one of those unique instances where the issue should be sent to the jury under proper instructions. The trial court did not err in denying cross-appellee/appellant's motion for summary judgment as to responsibility for testing and cross-appellant/appellee's informal request for summary judgment as to responsibility for soil testing, and in submitting the issue to the jury.

*Judgments affirmed. Pope, C. J., and Andrews, J., concur.*

DECIDED MAY 11, 1993.

*Bowman S. Garrett, Jr., Thomas A. Soderberg*, for appellant.
*Jones, Cork & Miller, H. Jerome Strickland, Thomas C. James III, Robert C. Norman, Jr.*, for appellees.