[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-16412
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 11, 2012
JOHN LEY
CLERK

D. C. Docket No.05-00585-CV-UNAS-RBP-W


THE UNIVERSITY OF ALABAMA BOARD OF TRUSTEES,

Plaintiff-
Counter-Defendant-
Appellee,

versus

NEW LIFE ART, INC.,
DANIEL A. MOORE,

Defendants-
Counter-Claimants-
Appellants.


_____

No. 10-10092
_____

D. C. Docket No. 7:05-CV-00585-UNAS-RBP


THE UNIVERSITY OF ALABAMA BOARD OF TRUSTEES,

versus

NEW LIFE ART, INC.,
DANIEL A. MOORE,

Defendants,
Counter Claimants,
Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(June 11, 2012)

Before MARTIN and ANDERSON, Circuit Judges, and SCHLESINGER,* District Judge.

ANDERSON, Circuit Judge:

Since 1979, Daniel A. Moore has painted famous football scenes involving the University of Alabama (the "University" or "Alabama"). The paintings feature realistic portrayals of the University's uniforms, including helmets, jerseys, and

_____

* Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

crimson and white colors. Moore has reproduced his paintings as prints and calendars, as well as on mugs and other articles.

In 2002, the University told Moore that he would need permission to depict the University's uniforms because they are trademarks. Moore contended that he did not need permission because the uniforms were being used to realistically portray historical events. The parties could not reach a resolution, and in March 2005, the University sued Moore in the Northern District of Alabama for breach of contract, trademark infringement, and unfair competition.

The outcome at the district court was split. The court granted summary judgment to Moore with respect to paintings and prints, and granted summary judgment to the University with respect to calendars, mugs, and other "mundane products." This appeal resulted. We affirm in part, reverse in part, and remand.

## I. FACTS

From 1979 to 1990, Moore painted historical Alabama football scenes without any kind of formal or informal relationship with the University.[1] From 1991 to 1999, Moore signed a dozen licensing agreements with the University to

---

[1] Although there was no relationship before 1991, the University was still aware of Moore's work as early as 1980. From 1980 through 1982, the University submitted twenty separate orders for unlicensed Moore prints that were then resold. Dkt. 294, exh. 20B at 2-10; dkt. 294, exh. 20C at 1-8; dkt. 294, exh. 20D at 1-8.

produce and market specific items, which would often include additional Alabama trademarks on the border or packaging, or would come with a certificate or stamp saying they were officially licensed products.

From 1991 to 2002, Moore produced other Alabama-related paintings and prints that were not the subject of any licensing agreements. He also continued to sell paintings and prints of images that had originally been issued before 1991. He did not pay royalties for any of these items, nor did the University request that he do so. Moore said that he would enter into a licensing agreement if he felt that it would help increase the sales of that particular product, or if he wanted the University—his alma mater—to benefit from royalties.

During this time, the University issued Moore press credentials so he could obtain material for his work. The University also asked Moore to produce an unlicensed painting on live television during a football game.

However, in January 2002, the University told Moore that he would need to license all of his Alabama-related products because they featured the University's trademarks.[2] In particular, the University asserted that Moore needed permission

---

[2] The one exception was that the University did not require that Moore obtain permission to sell any products that featured his paintings in conjunction with written material. Thus, the University had no qualms with Moore selling books that featured reproductions of his paintings along with stories, recaps, or historical information.

to portray the University's uniforms, including the jersey and helmet designs and the crimson and white colors.

Moore contended that he did not need permission to paint historical events and that there was no trademark violation so long as he did not use any of the University's trademarks outside of the "image area" of the painting (i.e., outside the original painting). Despite this disagreement, the University still sold Moore's unlicensed calendars in its campus stores for several years. It also displayed unlicensed paintings at its Bryant Museum and athletic department office.

The parties were unable to reach a satisfactory resolution, and the University brought suit on March 18, 2005, in the Northern District of Alabama. The University contended that (1) Moore had breached several terms of his prior licensing agreements and (2) Moore's paintings, prints, calendars, mugs, and other objects violated the Lanham Act by infringing the University's trademark rights in its football uniforms. See 15 U.S.C. § 1125(a).

The case took a meandering path through the district court, having been assigned at various points of the litigation to seven different district court judges.[3] Early in the proceedings, discovery was stayed on all issues not relevant to the

---

[3] There was also a previous appeal to this Court. See Bd. of Trs. of the Univ. of Ala. v. New Life Art, Inc., 336 Fed. App'x. 860 (11th Cir. 2009) (dealing with issues of immunity).

5

University's Lanham Act claims.[4]  After discovery, both parties moved for summary judgment.

The only issues on appeal in this case are those decided by Judge Propst, who concluded in November 2009 that (1) the prior licensing agreements did not require that Moore receive permission to portray the University's uniforms because the uniforms were not included in the agreements' definition of "licensed indicia"; (2) the University's colors had some secondary meaning[5] but were not especially strong marks on the trademark spectrum[6]; (3) Moore's depiction of the uniforms in paintings and prints was protected by the First Amendment and also was a fair use; and (4) Moore's depiction of the uniforms on mugs, calendars, and

---

[4]     In particular, the University contended that Moore re-issued one product whose licensing agreement specifically prohibited re-issuance without first receiving the University's permission.  The University also claimed that Moore had not paid royalties when he later re-issued certain works that had been the subject of a licensing agreement.

[5]     See Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1357 (11th Cir. 2007) ("Trademark or service mark protection is only available to 'distinctive' marks, that is, marks that serve the purpose of identifying the source of the goods or services.  Some marks are inherently distinctive; some marks, though not inherently distinctive, acquire distinctiveness by becoming associated in the minds of the public with the products or services offered by the proprietor of the mark; and some marks can never become distinctive.") (citations omitted).

[6]     See id. at 1357-58 ("Trademark law distinguishes four gradations of distinctiveness of marks, in descending order of strength: fanciful or arbitrary, suggestive, descriptive, and generic.  An arbitrary or fanciful mark bears no logical relationship to the product or service it is used to represent.  A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product.  A descriptive mark identifies a characteristic or quality of the service or product. . . .  [A] generic name refers to a 'particular genus or class of which an individual article or service is but a member.'") (citations omitted).

other "mundane products" was not protected by the First Amendment, was not a fair use, and would likely result in consumer confusion.

In accordance with these findings, the district court granted summary judgment to Moore on the paintings and prints, and to the University on the calendars, mugs, and other "mundane products." Both parties appealed the conclusions of the district court, which certified under Rule 54(b). The parties also agree that the district court's Rule 54(b) certification was proper, and we accept that the certification provides authority for this Court to address just the Lanham Act claims.[7] Fed. R. Civ. P. 54(b) ("When an action presents more than one claim for relief . . . , the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no just reason for delay."); Edwards v. Prime Inc., 602 F.3d 1276, 1288 (11th Cir. 2010) ("Appellate jurisdiction over an appeal from an interlocutory

_____

[7] We have jurisdiction pursuant to Rule 54(b), thus resolving the jurisdictional issue carried with the case. Thus, we address the claims involving products (i.e., creations of Moore) which were never the subject of a specific, written licensing agreement. These claims involve primarily Lanham Act issues but also include incidental contract issues of whether some broad language in the licensing agreements constitutes a conveyance by Moore of First Amendment or copyright interests that Moore might otherwise have had in the absence of the licensing agreements. By contrast, our Rule 54(b) jurisdiction does not extend to, and we do not address, claims involving objects which were the specific subject of a particular, written licensing agreement, and with respect to which the University argues that Moore re-issued prints, etc., without the University's permission. Issues relating to such specifically licensed paintings are primarily contractual issues which have not been addressed by the district court.

7

decision certified under Rule 54(b) is limited to the rulings or orders certified by the district court.").

We review de novo a grant of summary judgment. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1263 (11th Cir. 2010). "We will affirm if, after construing the evidence in the light most favorable to the non-moving party, we find that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id. at 1263–64.

We believe that the simplest way to address all of the arguments in this appeal is to divide the opinion based on the two categories of objects produced by Moore. With respect to both categories, we address only objects which were never the subject of a specific, written licensing agreement.[8] First we address the arguments of the respective parties with respect to a category of objects composed of paintings, prints, and calendars. Then we address the arguments of the parties with respect to a second category of objects composed of mugs and other "mundane products."[9]

## II. PAINTINGS, PRINTS, AND CALENDARS

---

[8] See supra note 7 (noting that we have Rule 54(b) jurisdiction over claims involving these never-licensed objects).

[9] The record suggests that there is only one set of mugs that was never licensed, and the only other "mundane products" we have noticed in the record are postcard-sized mini-prints. See dkt. 264, exh. V at 2-4.

In accordance with the district court's rulings, the University is appellant with respect to paintings and prints that "are of the same or larger sizes and of the same or better quality of such paintings and prints previously created, produced, manufactured and distributed by [Moore]."[10] Moore is appellant for calendars. We address these items together.[11]

The University first argues that it is unnecessary to reach the trademark issues in this appeal because the language of Moore's prior licensing agreements prohibits his unlicensed portrayal of the University's uniforms. We disagree.

A. Licensing Agreements

Through addenda, the parties renewed their 1995 licensing agreement ("1995 Agreement") annually through 2000. The 1995 Agreement states that it "cancels, terminates, and supersedes any prior agreement or understanding."[12] Accordingly, for the sake of simplicity, we focus on the 1995 Agreement's language, although we note that previous licensing agreements used substantially similar language in most respects.

---

[10] Dkt. 322 at 1.

[11] Even if we did not address calendars together with the paintings and prints, we would find as a matter of law that the University acquiesced with respect to the calendars. See Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1207 (11th Cir. 2008).

[12] Dkt. 262, exh. H at 11, ¶27.

The University contends that even after the 1995 Agreement and its addenda expired, Moore had to obtain permission to use any of the University's "licensed indicia," which the University argues includes football uniforms, on any items he produced.

The 1995 Agreement's definition of "licensed indicia" is very broad:

> "Licensed Indicia" means the names, symbols, designs, and colors of the [University], including without limitation, the trademarks, service marks, designs, team names, nicknames, abbreviations, city/state names in the appropriate context, slogans, logographics, mascots, seals and other symbols associated with or referring to the [University]. Licensed Indicia includes those in Appendix B and indicia adopted, used and approved for use by the [University]. Any newly adopted indicia shall be deemed to be additions to the Licensed Indicia in Appendix B and shall be subject to the terms and conditions of the Agreement.[13]

The items listed in Appendix B are the phrases "University of Alabama," "Roll Tide," "Crimson Tide," "U of A," "Bama," and "Alabama." It also lists the colors "Crimson PMS 201"[14] and "Gray PMS 429" and includes images of the University's official seal, an elephant wearing a sweater with an "A" on it, an "A" with an elephant charging through it, and an "A" with the University's official seal

---

[13] Id. at 2, ¶ 1(b).

[14] "PMS" refers to the Pantone Matching System, which is an "organizational scheme that matches particular colors with individual identification numbers." Pantone, Inc. v. Esselte Letraset, Ltd., 878 F.2d 601, 602-03 (2d Cir. 1989). This allows very specific colors to be referenced using just a general color code in combination with a number.

superimposed.

The design and colors of uniforms are not specifically mentioned anywhere in the 1995 Agreement, but the University contends that they are nonetheless covered by the broad language defining "licensed indicia" and the reference in Appendix B to the colors "Crimson PMS 201" and "Gray PMS 429"—the University's crimson and white colors.[15]

The 1995 Agreement also requires that Moore "shall not use the Licensed Indicia for any purpose other than upon or in connection with"[16] explicitly licensed items, and that the "terms and conditions of this Agreement necessary to protect the rights and interests of the [University] in [its] Licensed Indicia . . . shall survive the termination or expiration of this Agreement."[17]

The University contends that these clauses, when taken together, clearly require Moore to obtain permission whenever he depicts the University's football uniforms in any of his products.[18] The district court disagreed with the University and held that the parties did not intend "licensed indicia" to include colors on

---

[15]    In the PMS, white is considered a shade of gray.

[16]    Dkt. 262, exh. H at 3, ¶2(f)(1).

[17]    Id. at 10, ¶22(a); see also id. at 4, ¶6(e); id. at 10, ¶20(a).

[18]    As noted supra at note 2, the one exception is that the University does not contend that Moore must obtain permission when his paintings are reproduced in conjunction with written material.

11

uniforms. The court concluded that the colors in Appendix B were listed only with respect to the logos and words actually shown in the appendix. Uniforms are not shown in the appendix, nor are they otherwise listed anywhere in the 1995 Agreement. Thus, the district court held as a matter of law that Moore's portrayal of the University's colors on uniforms in his paintings and other objects was not prohibited by the licensing agreements.

We believe that the 1995 Agreement is ambiguous on this issue. While the definition of "licensed indicia" is broad, there is also language indicating that it would not include the portrayal of uniforms in the <u>content</u> of a painting, print, or calendar. For instance, the 1995 Agreement repeatedly refers to products "bearing" "licensed indicia."[19] Other sections refer to "licensed indicia" being used "on" products.[20] Another provision instructs that Moore "shall not contract with any party for the production or application of Licensed Indicia by that party" without authorization.[21] It seems unlikely that uniforms in a painting would be "produced" or "applied." This language implies that the parties intended "licensed indicia" to refer to the packaging or labels placed upon products, rather than

---

[19]     Dkt. 262, exh. H at 2, ¶1(c); <u>id.</u> ¶1(f); <u>id.</u> at 3, ¶2(f)(5).

[20]     <u>Id.</u> at 2, ¶2(a); <u>id.</u> at 4, ¶4(a); <u>id.</u> at 6, ¶12(a).

[21]     <u>Id.</u> at 3, ¶2(f)(3); <u>see also</u> <u>id.</u> ¶2(f)(2).

12

uniforms depicted within the content of a painting, print, or calendar.

Also weighing in favor of ambiguity is a section indicating that there must be a circled "R" or the "TM" symbol beside all "licensed indicia."[22]  Under the University's view, this would apparently require that every player portrayed in a painting would need an "R" or "TM" symbol accompanying his uniform.

Additionally, the University's proffered interpretation of the 1995 Agreement would mean that, just in exchange for the right to label his annual calendars as officially sponsored, Moore had effectively indentured himself to the University, in that he would need to perpetually obtain permission to paint any historically accurate scenes from Alabama football games.  Given the contradictions present in the 1995 Agreement, we conclude that it is ambiguous as to whether the parties intended that Moore would have to obtain permission to depict Alabama uniforms in his products.

However, for paintings, prints, and calendars, we can resolve this ambiguity on the basis of the parties' subsequent course of conduct.  The 1995 Agreement states that it will be governed by Georgia law.  In Georgia, where "the contract is ambiguous to such a degree that the question of the parties' intent in this regard cannot be ascertained as a matter of law by applying usual statutory rules of

_____

[22]      Id. at 6, ¶12(a).

13

contract construction," courts should examine "the course of conduct and actions of the various parties" with the understanding that "the construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them." Am. Honda Motor Co. v. Williams & Assocs., Inc., 431 S.E.2d 437, 443 (Ga. Ct. App. 1993) (quotations and alteration omitted).[23] The most relevant evidence for this analysis would be the parties' behavior—active or passive—during and after the time when they were entering into licensing agreements (i.e., from 1991 until this litigation).

There is considerable evidence indicating that the parties did not intend that Moore's portrayal of the uniforms in unlicensed paintings, prints, and calendars would violate the licensing agreements. Between 1991 and 2002, Moore produced several new paintings and prints that ubiquitously featured the University's uniforms. He also continued to sell paintings and prints of works that had originally been issued before 1991. Despite the public notoriety of Moore's work, the University never requested (until this litigation) that he pay royalties on these unlicensed items.

---

[23] Some of the previous licensing agreements indicate that they will be construed under Alabama law, but Alabama similarly allows course of conduct to clarify an ambiguous contract. "If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity." Voyager Life Ins. Co. v. Whitson, 703 So. 2d 944, 949 (Ala. 1997).

From 2001 to 2004, the University sold over $12,000 worth of Moore's unlicensed calendars in its campus store.[24] On at least one occasion, the University detached the images from an unlicensed calendar, then framed and sold them.[25] The Bryant Museum, which is run by the University, displayed and sold unlicensed Moore prints and featured an unlicensed painting on the cover of its brochure.[26]

In 2001, the University asked Moore to complete a sketch on live television during a nationally televised football game; this sketch was unlicensed and featured the University's football helmet.[27] For many years, the University had displayed unlicensed Moore prints in its own athletic department office and had granted Moore press credentials so he could take photographs to be used as source material for paintings, many of which were never licensed.[28]

The parties' course of conduct clearly indicates that they did not intend that Moore would need permission every time he sought to portray the University's uniforms in the content of his paintings, prints, and calendars. See Am. Honda

---

[24]    Dkt. 294, exh. 20A at 2-9.

[25]    Dkt. 116, exh. I at 25.

[26]    Id., exh. K at 9.

[27]    Dkt. 294, exh. 4 at 2-3.

[28]    Dkt. 116, exh. A at 29.

<u>Motor Co.</u>, 431 S.E.2d at 443. There is no genuine dispute on this issue, and accordingly we reject the University's argument that the licensing agreements end this appeal.[29]

### B. <u>Trademark Claims</u>

Because we find that the licensing agreements were not intended to prohibit Moore's depiction of the University's uniforms in unlicensed paintings, prints, or calendars, we proceed to address the University's trademark claims with respect to these items. The University's claim is that Moore's unlicensed paintings, prints, and calendars infringe on the University's trademarks because the inclusion in these products of the University's football uniforms (showing the University's crimson and white colors) creates a likelihood of confusion on the part of buyers that the University sponsored or endorsed the product.

The University argues that its uniforms are "strong" trademarks and that its survey provides strong evidence of confusion sufficient to establish a likelihood of

---

[29] Since this case is before us on Rule 54(b), we address the licensing agreements only to the extent necessary to resolve the University's Lanham Act claims. <u>See</u> <u>Edwards</u>, 602 F.3d at 1288 ("Appellate jurisdiction over an appeal from an interlocutory decision certified under Rule 54(b) is limited to the rulings or orders certified by the district court."). Therefore, to the extent necessary, the district court upon remand will need to resolve the University's claims that (1) Moore re-issued one product whose licensing agreement specifically prohibited re-issuance without first receiving the University's permission, and (2) Moore has failed to pay royalties when he later re-issued certain works that had explicitly been the subject of a licensing agreement. <u>See</u> dkt. 260 at 28; dkt. 262, exh. E at 6, ¶ 9.

confusion to sustain a Lanham Act violation by Moore. See 15 U.S.C. §

1125(a)[30]; Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769, 112 S. Ct.

2753, 2758 (1992).[31] Contrary to the University's argument, the district court

concluded there was a "weak mark and [merely] some likelihood of confusion."[32]

And contrary to the University's argument that its trademarks triggered the sales

of Moore's products, the district court concluded with respect to the paintings and

prints that "the plays and Moore's reputation established during a period when his

---

[30]

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

[31] Although the University's uniforms are not registered with the United States Patent and Trademark Office, "it is common ground that § 43(a) protects qualifying unregistered trademarks." Two Pesos, 505 U.S. at 768, 112 S. Ct. at 2757.

[32] Dkt. 321 at 4.

17

art was agreeably not licensed are what predominantly trigger the sales."[33] Similarly, with respect to the University's survey upon which the University relies to support likelihood of confusion, the district court concluded "that the survey lacks strength because of its manner of taking, the form of the questions, the nature of the surveyed customers, and the number of responders. It involved only one print. The questions are loaded with suggestions that there is a 'sponsor' other than the artist."[34] We note that Moore's signature was prominent on the paintings, prints, and calendars, clearly telegraphing that he was the artist who created the work of art. We also note that the one print used in the survey was in fact specifically licensed, and thus had an actual, historical sponsorship association with the University. Although we are in basic agreement with the district court's evaluation of the mark and the degree of confusion as to the source and sponsorship of the paintings, prints, and calendars, we need not in this case settle upon a precise evaluation of the strength of the mark or the degree of likelihood of confusion. As our discussion below indicates, we conclude that the First Amendment interests in artistic expression so clearly outweigh whatever consumer confusion that might exist on these facts that we must necessarily

---

[33]     Dkt. 311 at 6-7.

[34]     Id. at 8.

18

conclude that there has been no violation of the Lanham Act with respect to the paintings, prints, and calendars.

The First Amendment's protections extend beyond written and spoken words. "[P]ictures, films, paintings, drawings, and engravings . . . have First Amendment protection[.]" Kaplan v. California, 413 U.S. 115, 119-20, 93 S. Ct. 2680, 2684 (1973); see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 569, 115 S. Ct. 2338, 2345 (1995) ("[T]he Constitution looks beyond written or spoken words as mediums of expression.").

The University argues that Moore's paintings, prints, and calendars "are more commercial than expressive speech and, therefore, entitled to a lower degree" of First Amendment protection. See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 562-63, 100 S. Ct. 2343, 2350 (1980) ("The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). However, these items certainly do more than "propos[e] a commercial transaction." Id. at 562, 100 S. Ct. at 2349. Naturally, Moore sells these items for money, but it "is of course no matter that the dissemination [of speech] takes place under commercial auspices." Smith v. California, 361 U.S. 147, 150, 80 S. Ct. 215, 217 (1959). Like other expressive speech, Moore's paintings, prints, and calendars are entitled to full protection

19

under the First Amendment. Accord ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 925 (6th Cir. 2003).

Thus, we must decide whether Moore's First Amendment rights will give way to the University's trademark rights. We are not the first circuit to confront this issue. In 1989, the Second Circuit decided Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989), which is the landmark case for balancing trademark and First Amendment rights. In Rogers, the defendant created a film about two fictional Italian dancers who were called "Ginger and Fred," which was the film's title. Id. at 996-97. Ginger Rogers, a famous dancer who often worked with Fred Astaire, sued under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), arguing that the film's title falsely implied that she was endorsing or featured in the film. Rogers, 875 F.2d at 997.

The court noted that the purchaser of artistic works, "like the purchaser of a can of peas, has a right not to be misled as to the source of the product." Id. at 997-98. However, the court concluded that the Lanham Act should be read narrowly to avoid impinging on speech protected by the First Amendment. Id. at 998-1000. Thus, the court adopted a balancing test:

> We believe that in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the

context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or if it has some artistic relevance, unless the title explicitly misleads as to the source of the work.

Id. at 999.[35]

Under the facts of Rogers, the court concluded that "the slight risk that such use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression." Id. at 1000. Accordingly, the court ruled in favor of the movie's producers because the title was artistically relevant to the film, there had been no evidence of explicit misleading as to source, and the risk of confusion was "so outweighed by the interests in artistic expression as to preclude application of the Lanham Act." Id. at 1001.

Circuit courts have also applied Rogers in cases where trademark law is being used to attack the content—as opposed to the title—of works protected by the First Amendment. In Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, 886 F.2d 490 (2d Cir. 1989), the defendant published humorous versions of "Cliffs Notes" study books and had imitated the plaintiff's trademarked black

---

[35]    Examples given in Rogers of titles that—if done without permission—would be explicitly misleading included "Jane Fonda's Workout Book," "Nimmer on Copyright," and any work claiming to be an "authorized biography." Rogers, 875 F.2d at 999.

21

and yellow covers.  Id. at 492.  The court held that the Rogers test was "generally

applicable to Lanham Act claims against works of artistic expression" and found

that the parody books were protected by the First Amendment because the

defendant had not explicitly misled consumers as to the source or content of the

books.  Id. at 495-96.

In ESS Entertainment 2000, Inc. v. Rock Star Videos, Inc., 547 F.3d 1095

(9th Cir. 2008), a scene in the defendant's video game featured the trademark of

the plaintiff's entertainment club located in Los Angeles.  Id. at 1096-98.  The

Ninth Circuit held that there "is no principled reason why [Rogers] ought not also

apply to the use of a trademark in the body of the work."  Id. at 1099.  The court

found that the defendant's use of the trademark did not explicitly mislead as to the

source or content of the video game, and thus the First Amendment protected the

defendant's use of the plaintiff's trademark.  Id. at 1099-101.

In the case perhaps most similar to the one sub judice, the Sixth Circuit

addressed a claim of false endorsement under the Lanham Act where an artist had

painted a collage of Tiger Woods images.  ETW Corp. v. Jireh Publ'g, Inc., 332

F.3d 915, 918-19 (6th Cir. 2003).  Woods's publicity company sued the artist, and

the court applied the Rogers balancing test and found that Woods's image on the

painting had artistic relevance to the underlying work and did not explicitly

22

mislead as to the source of the work. Id. at 936-37. As a result, the painting was protected by the First Amendment against a claim of false endorsement. Id. at 937.

The University contends that none of those cases are analogous to our current set of facts. It argues that Cliffs Notes and ESS Entertainment are not applicable because those cases involved parody, whereas Moore's paintings do not. However, neither Rogers nor ETW dealt with parody, yet the courts in those cases still read the Lanham Act narrowly to avoid First Amendment concerns. See Rogers, 875 F.2d at 999-1000; ETW, 332 F.3d at 937. Additionally, courts adopting Rogers have noted that it is "generally applicable to works of artistic expression," not just parodies. Cliffs Notes, 886 F.2d at 495; see also ESS Entm't, 547 F.3d at 1099 ("artistic works"); ETW, 332 F.3d at 937 ("artistic works").

The University responds by saying that we should not consider Rogers or ETW because those cases dealt with rights of publicity, which the University contends are much weaker than trademark rights. However, Rogers and ETW both dealt also with Lanham Act false endorsement claims,[36] and we have never treated false endorsement and trademark infringement claims as distinct under the Lanham Act. See Tana v. Dantanna's, 611 F.3d 767, 777 n.9 (11th Cir. 2010)

---

[36] Rogers, 875 F.2d at 997; ETW, 332 F.3d at 936-37.

("[W]e have . . . never recognized a separate claim of false endorsement, distinct from trademark infringement under § 43(a) . . . ."); see also Landham v. Lewis Galoob Toys, Inc., 227 F.3d 619, 626 (6th Cir. 2000) ("A false designation of origin claim . . . under § 43(a) of the Lanham Act . . . is equivalent to a false association or endorsement claim . . . .").[37]

Therefore, we have no hesitation in joining our sister circuits by holding that we should construe the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark. This requires that we carefully "weigh the public interest in free expression against the public interest in avoiding consumer confusion." Cliffs Notes, 886 F.2d at 494. An artistically expressive use of a trademark will not violate the Lanham Act "unless the use of the mark has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless it explicitly misleads as to the source or the content of the work." ESS Entm't, 547 F.3d at 1099 (quotations and alterations omitted); see also Rogers, 875 F.2d at 999.

In this case, we readily conclude that Moore's paintings, prints, and calendars are protected under the Rogers test. The depiction of the University's

_____

[37]    Indeed, false endorsement and trademark infringement are derived from the same sentence of the Lanham Act. 15 U.S.C. § 1125(a)(1).

uniforms in the content of these items is artistically relevant to the expressive underlying works because the uniforms' colors and designs are needed for a realistic portrayal of famous scenes from Alabama football history. Also there is no evidence that Moore ever marketed an unlicensed item as "endorsed" or "sponsored" by the University, or otherwise explicitly stated that such items were affiliated with the University. Moore's paintings, prints, and calendars very clearly are embodiments of artistic expression, and are entitled to full First Amendment protection. The extent of his use of the University's trademarks is their mere inclusion (their necessary inclusion) in the body of the image which Moore creates to memorialize and enhance a particular play or event in the University's football history. Even if "some members of the public would draw the incorrect inference that [the University] had some involvement with [Moore's paintings, prints, and calendars,] . . . that risk of misunderstanding, not engendered by any overt [or in this case even implicit] claim . . . is so outweighed by the interest in artistic expression as to preclude" any violation of the Lanham Act. Rogers, 875 F.2d at 1001.

Because Moore's depiction of the University's uniforms in the content of his paintings, prints, and calendars results in no violation of the Lanham Act, we affirm the district court with respect to paintings and prints, and reverse with

25

respect to calendars.[38]

### III. MUGS AND OTHER "MUNDANE PRODUCTS"

We now proceed to the issues related to Moore's depiction of the University's uniforms on "mini-prints, mugs, cups, . . . flags, towels, t-shirts, or any other mundane products."[39] Moore is appellant for these items, which we will refer to as "mugs and other 'mundane products.'"

A. Licensing Agreements

As with the paintings, prints, and calendars, the University argues that the licensing agreements dispositively determine its claim for royalties with respect to the mugs and other "mundane products." However, as discussed supra at Part II.A, the licensing agreements are ambiguous with respect to whether Moore needed permission to portray the University's uniforms. For paintings, prints, and calendars, we could resolve this ambiguity by looking to the parties' subsequent course of conduct.

However, for mugs and other "mundane products," we conclude that the

---

[38] Accordingly, for Moore's paintings, prints, and calendars, we need not decide (1) whether the University acquiesced to Moore's conduct, (2) whether any copyrights Moore owns in the original paintings allow him to produce derivative prints or calendars without concern for trademark law, (3) whether the University's marks are functional, or (4) whether Moore's actions constitute fair use.

[39] Dkt. 322 at 2.

26

record is not clear enough for us to resolve the ambiguity as a matter of law. There is a lack of evidence indicating how the parties viewed Moore's portrayal of the University's uniforms on mugs and other "mundane products." In thirty years, Moore has produced only three sets of mugs. The fact that two of the sets were licensed perhaps indicates that the parties thought that Moore would need permission to produce mugs portraying the University's uniforms. However, the fact that one set was not licensed implies the opposite. During the course of this litigation, the parties have focused almost exclusively on the paintings, prints, and calendars, with little attention paid to mugs and other objects.

The University observes that Moore once sought permission from the University before using a symbol on one of his mugs. The University contends that this shows that the parties believed that permission was required before Moore could use the University's colors and symbols, at least when reproduced on mugs. However, the symbol in question appears to be an "A" with an elephant charging through it, which was a symbol explicitly included in the 1995 Agreement's Appendix B.[40] This provides no insight into how the parties viewed Moore's depiction of the University's <u>uniforms</u> on mugs and other "mundane products."

---

[40] <u>See</u> dkt. 262, exh. N at 2-3; <u>id.</u>, exh. D at 6.

Because disputed issues of material fact remain, we reverse the grant of summary judgment to the University on this licensing issue.

B. Moore's Copyright Argument

Moore argues that because his original paintings do not infringe the University's trademarks, he has an unfettered right to produce derivative works featuring those paintings. We disagree with this broad contention. "[T]he defendant's ownership of or license to use a copyrighted image is no defense to a charge of trademark infringement. It should be remembered that a copyright is not a 'right' to use: it is a right to exclude others from using the copyrighted work." 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 6:14 (4th ed. 2011) (emphasis added); see also Fed. Trade Comm'n v. Real Prods. Corp., 90 F.2d 617, 619 (2d Cir. 1937) ("A copyright is not a license to engage in unfair competition.").

If it were otherwise, a person could easily circumvent trademark law by drawing another's trademark and then placing that drawing on various products with impunity. Selling the copyrighted drawing itself may not amount to a trademark infringement, but its placement on certain products very well might. See, e.g., Nova Wines, Inc. v. Adler Fels Winery LLC, 467 F. Supp. 2d 965, 983 (N.D. Cal. 2006) (holding that the copyright holder of a Marilyn Monroe

photograph could not use the photo on wine bottles because it would infringe the trademark rights of another winery that sold wine in bottles that prominently featured images of Monroe); McCarthy, supra, § 6:14. Thus, we reject Moore's argument that his copyright in the paintings gives him an automatic defense to any trademark claims made by the University.

C. Trademark Claims

Because the district court ruled against Moore with respect to the mugs and other "mundane products," Moore is appellant for these items. However, he has waived any challenge to the district court's conclusions that his use of the uniforms on these products was not a fair use and was not protected by the First Amendment. "Under our caselaw, a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. Otherwise, the issue—even if properly preserved at trial—will be considered abandoned." United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).[41]

---

[41]        Several reasons persuade us that Moore has waived any First Amendment/fair use challenge to the district court's holding with respect to the mugs and other "mundane products." First, we do not believe that Moore's ambiguous and conclusory assertions in his brief's summary of the argument and in his conclusion fairly raise the issue on appeal. It is true that the First Amendment and fair use are mentioned in Moore's summary of the argument. It is also true that the vague inference there that the district court's rationale with respect to the paintings should also apply to the other objects is asserted more clearly in a single sentence in the conclusion of Moore's initial brief. However, the brief mention of the First Amendment or fair use in the summary of the argument seems to focus on the paintings themselves, and any separate focus on the mugs and "mundane products" seems to anticipate only Moore's argument under his

brief's first argument-heading about his right to incorporate his copyrighted images into derivative works.  More significantly, Moore does not, in the summary of the argument or anywhere else in his initial brief, elaborate upon the bald and conclusory assertion that the district court's First Amendment rationale with respect to the paintings should apply with equal force to the mugs and other "mundane products."  See Fed. R. App. P. 28(a)(9)(A) (requiring that an appellant's brief must contain, under an appropriate heading, the "appellant's contentions and the reasons for them, with citations to the authorities"); see also Jernigan, 341 F.3d at 1283 n.8 (to the same effect).  For example, Moore's brief never explains how the Rogers balancing test should operate with respect to the mugs, and never explains why the district court's rulings with respect to the paintings and prints should apply with equal force to the mugs and other "mundane products."

The second reason persuading us that Moore has not fairly presented on appeal such a First Amendment/fair use challenge is that even the above-mentioned bald and conclusory reference to the First Amendment does not appear under an appropriate heading. There are only two headings in Moore's initial brief: one focused upon Moore's argument, derived from copyright law, that he has a right to incorporate his copyrighted images into derivative works; and the other focused upon the trademark defense of acquiescence.  See Jernigan, 341 F.3d at 1283 n.8 (declining to entertain passing references to an argument embedded under different topical headings).  Third, the issues set forth in Moore's initial brief do not include a First Amendment/fair use challenge to the district court's holding with respect to the mugs and other "mundane products."  Finally, Moore's initial brief does not even cite the leading case upon which the district court relied, i.e., the Second Circuit decision in Rogers, nor does it cite other relevant cases applying that balancing test.

Although we have some reluctance to invoke this technical rule, we believe its application is soundly based in our caselaw and is warranted in this case.  For example, probably because Moore's initial brief wholly failed to elaborate on a First Amendment/fair use challenge to the district court's holding with respect to the mugs and other "mundane products," and wholly failed to explain how the Rogers balancing test would apply with respect thereto, the University's brief in response also contains no discussion of how the balancing test would apply to the mugs and other "mundane products," as opposed to the paintings and prints.  See Jernigan, 341 F.3d at 1283 n.8.  We decline to address that issue sua sponte, with no assistance from the parties.

Also waived and abandoned is any challenge to the propriety of the district court's reliance (with respect to the mugs and other "mundane products") on University of Georgia Athletic Ass'n v. Laite, 756 F.2d 1535 (11th Cir. 1985), and Boston Pro Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004 (5th Cir. 1975).  See dkt. 311 at 6; dkt. 321 at 4.  These two cases are not even cited in Moore's initial brief.  Nor does the brief assert the argument based on Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 123 S. Ct. 2041 (2003), which is made in the Amicus brief.  See Br. of Amici Curiae Intellectual Property

Acquiescence is the only remaining trademark argument that Moore has preserved on appeal for these items.  Acquiescence is a statutory defense under 15 U.S.C. § 1115(b)(9).  "The defense of acquiescence requires proof of three elements: (1) the plaintiff actively represented it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1207 (11th Cir. 2008) (citation and quotation omitted).  "The difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent."  Id.  Thus, the relevant evidence for acquiescence would be active behavior by the University during the time that Moore has been portraying the University's uniforms (i.e., since 1979).

"Active consent" does not necessarily mean an explicit promise not to sue. It only requires "conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant."  Creative Gifts, Inc. v. UFO, 235 F.3d 540, 547-48 (10th Cir. 2000); see also Coach House Rest., Inc. v. Coach & Six Rests., Inc., 934 F.2d 1551, 1558, 1564 (11th Cir. 1991).

---

Law Professors at 7-9.

31

Here, a finding of acquiescence on the mugs or other "mundane products" would estop the University from prosecuting its action against Moore with respect to those items, see Coach House, 934 F.2d at 1564, unless the University can show that "'inevitable confusion' arises from the continued dual use of the marks." SunAmerica Corp. v. Sun Life Assurance Co. of Can., 77 F.3d 1325, 1334 (11th Cir. 1996). As we noted in our discussion supra at Part III.A, the record is not clear with respect to the parties' course of conduct towards Moore's sale of mugs and other "mundane products." The record relevant to acquiescence on these items is similarly undeveloped. Accordingly, we remand this acquiescence issue for the district court to conduct further proceedings, if necessary.

## IV. CONCLUSION

As evidenced by the parties' course of conduct, Moore's depiction of the University's uniforms in his unlicensed paintings, prints, and calendars is not prohibited by the prior licensing agreements. Additionally, the paintings, prints, and calendars do not violate the Lanham Act because these artistically expressive objects are protected by the First Amendment, by virtue of our application of the Rogers balancing test. The uniforms in these works of art are artistically relevant to the underlying works, Moore never explicitly misled consumers as to the source of the items, and the interests in artistic expression outweigh the risk of confusion

as to endorsement.  Accordingly, we affirm the judgment of the district court with respect to the paintings and prints, and reverse with respect to the prints as replicated on calendars.[42]

With respect to the licensing agreements' coverage of the mugs and other "mundane products," we reverse the district court because disputed issues of fact remain.  See, e.g., Alvarez, 610 F.3d at 1271 (reversing a grant of summary judgment with respect to an employee's retaliation claim, since the employer's motivations for terminating the employee remained unclear from the record, adding that the "issue can be resolved at trial, if necessary").  Moore has not argued on appeal that his actions with respect to these items constituted fair use or were protected by the First Amendment, and therefore any such protection has been waived, and we need not address those issues with respect to the mugs and other "mundane products."  We remand this case to the district court for further proceedings, consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[42]    We disagree with the district court with respect to such calendars for several reasons.  First, the First Amendment interests in expressive art apply with equal (or near equal) force to prints used in Moore's calendars.  Second, prints replicated on calendars would be of a size more comparable to other prints, and would be more analogous to those than to the smaller replications on mugs or post-card-sized mini-prints, where the artistic work is much less likely to have been considered significant by the purchaser.  Finally, as noted above, the course of conduct of the parties with respect to the calendars establishes acquiescence.