[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 21-13458

————————————————

MGFB PROPERTIES, INC.,
FLORA-BAMA MANAGEMENT LLC,
FLORA-BAMA OLD S.A.L.T.S. INC,

Plaintiffs-Appellants,

versus

VIACOM INC,
f.k.a.
MTV Networks,

Defendant,

495 PRODUCTIONS HOLDINGS LLC,
495 PRODUCTIONS SERVICES LLC,

2                    Opinion of the Court                    21-13458

VIACOMCBS INC.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:19-cv-00257-RH-MJF

_____

Before LUCK, BRASHER, and HULL, Circuit Judges.

HULL, Circuit Judge:

This dispute is about the right to use the word "Floribama" and lies at the crossroads of the Lanham Act and the First Amendment.

Plaintiffs-Appellants MGFB Properties, Inc. ("MGFB"), Flora-Bama Management LLC ("Flora-Bama Mgmt."), and Flora-Bama Old S.A.L.T.S. Inc. ("Old SALTS") (collectively, "Plaintiffs") own and operate the Flora-Bama Lounge, Package and Oyster Bar ("Lounge") on the Florida-Alabama border. The Lounge has been in operation since 1964 and has gained regional fame by hosting many entertainment and athletic events.

Defendants-Appellees 495 Productions Holdings LLC and 495 Productions Services LLC (jointly referred to as "495

Productions"), and ViacomCBS Inc. ("Viacom") (collectively, "Defendants") create and distribute television programs, including the hit reality series *Jersey Shore* and its spin-off *MTV Floribama Shore*.

Plaintiffs sued Defendants, alleging that the title of Defendants' series, *MTV Floribama Shore*, infringes on Plaintiffs' Flora-Bama trademarks. The district court granted summary judgment to Defendants. Plaintiffs timely appealed. After careful review and with the benefit of oral argument, we affirm the district court's judgment for Defendants.

## I.    THE PARTIES' BUSINESSES

### A.    Plaintiffs

Plaintiff MGFB is primarily an asset-holding company. It owns the "FLORA-BAMA" trademarks and the property on which the Lounge is located. MGFB registered its federal trademark in January 2013. The federal trademark covers use of the trademark in connection with "bar and restaurant services" and several entertainment services, including arranging, organizing, conducting, and hosting "social entertainment events," live musical performances, and "competitions for fish throwing." MGFB also obtained Florida and Alabama state trademarks covering similar services.

Plaintiffs have the same principals: John McInnis III, Cameron Price, Joe Gilchrist, and Pat McLellan. MGFB licenses its trademarks to Flora-Bama Mgmt. and Old SALTS.

Plaintiff Flora-Bama Mgmt. is responsible for the day-to-day operations of the Lounge and its related establishments (e.g., the Flora-Bama Ole River Grill, the Flora-Bama Liquor & Lotto, and the Flora-Bama Yacht Club).  Plaintiff Old SALTS is responsible for managing the Flora-Bama marina and operating watersports and transportation services.

Plaintiffs continuously have used their "FLORA-BAMA" trademarks in connection with Plaintiffs' entertainment, food, and drink establishments.  They aggressively defend the trademarks, sending more than 80 cease-and-desist letters to businesses across the region.

Plaintiffs' Lounge and MGFB's trademarks have been featured in artistic works by third parties.  In "Ragtop Day," Jimmy Buffett sings, "Get ourselves a cool one at the Flora-Bama, ya!" Jimmy Buffett, Ragtop Day (1984).  Two songs are named after the Lounge: Kenny Chesney's "Flora-Bama" and Neil Dover's "FloraBama Time."

McInnis, a principal in all three Plaintiffs and president of MGFB, allowed these artists to use Flora-Bama in the songs.  For the Chesney song, McInnis testified that Chesney called him to say he had written a song about the Lounge and wanted to call it Flora-Bama, and McInnis told him "that's great [and h]ave at it." For the Dover song, McInnis could not recall whether there was a formal license agreement between Dover and the Plaintiffs, but McInnis said the Plaintiffs "100 percent gave him permission to use the title."

Additionally, Kenny Chesney performed on the Lounge's beachfront stage in front of thousands of fans at a 2014 concert. His performance was broadcast on Country Music Television ("CMT"), a Viacom channel. The agreement granting CMT a license to broadcast that program does not mention Plaintiffs. But Plaintiffs contend they "verbally" licensed their trademark to Kenny Chesney and the company that represents him, Blue Chair Bay Records, and then Blue Chair Bay Records sublicensed the rights to Viacom for the broadcast on CMT. The live concert was called the "Flora-Bama Jama," and the television program was called "Kenny Chesney: Live at the Flora-Bama."

"Flora-Bama" is also featured in a few book titles: *Food n' Fun at the Flora-Bama*, *Bushwhacked at the Flora-Bama*, and *If the Flora-Bama Walls Could Talk: If the Walls Could Talk*.[1] These books were written by Chris Warner. Warner obtained a license to use "Flora-Bama" in the title of his books. The agreement was entered into on August 21, 2019—several years after the books were published and a few weeks after Plaintiffs' complaint in this case was filed on August 6, 2019. McInnis contends the agreement with Warner was verbal from the beginning, and the parties later consummated it in writing.

---

[1] *Food n' Fun at the Flora-Bama* features recipes by the owners, musicians, songwriters, bartenders, and others from the Lounge. *Bushwhacked at the Flora-Bama* recounts tales from the Lounge. *If the Flora-Bama Walls Could Talk: If the Walls Could Talk* discusses the graffiti in the Lounge.

Lastly, "Flora-Bama" is featured in a few films, such as *Mullet Men* (a documentary about Flora-Bama's fish-throwing competition that Plaintiffs sell at the Lounge's giftshop) and *Last American Roadhouse: The Documentary of the Flora-Bama* (a DVD that Plaintiffs sell at the Lounge's gift shop).

From 2012 to 2019, Plaintiffs spent about $1.9 million in advertising "Flora-Bama" branded establishments. Plaintiffs' Lounge and their related businesses have been featured in major news outlets, such as *The New York Times* and *CNN*, and received multiple "Best Of" awards, such as the "Best U.S. Beach Bar."

## B.    Defendants

Defendant Viacom is a global media and entertainment company that operates several television brands, including MTV, VH1, Nickelodeon, and Comedy Central. Defendant 495 Productions is a television production studio that contracts with companies like Viacom to produce reality television series.

In 2009, 495 Productions and Viacom released a hit television series called *Jersey Shore*, which profiled "a group of fun-loving 20-somethings who lived together in a beach house in Seaside Heights, New Jersey." *Jersey Shore* lasted six seasons, thanks in part to the distinctive subculture its cast was perceived to belong to. That sub-culture centered on a love of clubbing, taking care of one's physical appearance, and a dedication to family and Italian culture.

The success of *Jersey Shore* spawned several international spin-offs also produced by 495 Productions and broadcasted by MTV. These spin-offs included *Warsaw Shore*, *Acapulco Shore*, and *Geordie Shore*. Like *Jersey Shore*, the spin-offs were dedicated to profiling subcultures of 20-somethings in different parts of the world.

### C.    Casting Calls at the Lounge

The parties are familiar with one another. In 2011, 2013, and 2014, 495 Productions approached Plaintiffs about using the Lounge for a television show and casting calls. In January 2017, a development executive at 495 Productions emailed Plaintiffs again: "I wanted to reach out to you about the prospective of shooting a show at Flora-Bama. . . . I came across the bar on many 'Best Of' lists and it looks like the perfect location!" Plaintiffs allowed 495 Productions to have a few casting calls at the Lounge, but nothing more.

## II.    DEFENDANTS' CREATION OF *MTV FLORIBAMA SHORE*

### A.    Defendants' Seventh *Shore* Series

In 2016, MTV's president, Chris McCarthy, made it a priority to bring the *Shore* franchise back to the United States. McCarthy wrote SallyAnn Salsano, the president of 495 Productions, that he wanted to build out the *Shore* franchise like the *Real Housewives* franchise, with multiple series in different

locations: "Gulf Shore, Florida Shore, Jersey Shore, South Shore, etc."

Defendants began to develop a seventh *Shore* series, this one focused on Southern beach culture. Defendants wanted to highlight "young [S]outhern folks" who go to "shore houses" or "spend summers" on the Gulf of Mexico, extending from the Florida panhandle into Alabama and Mississippi.

## B.   Survey and Market Research

MTV commissioned a survey of 300 young people familiar with the region to measure awareness and perceptions of the culture and nightlife in various beach towns. Then, 495 Productions prepared a 32-page slide deck, titled "Gulf Shores," profiling the region. One slide identified the region as spanning from Biloxi, Mississippi, to Panama City Beach, Florida. The slide deck noted the "Flora-Bama [Lounge]" is a "[f]amous, open-air bar," but it also used the term "Florabama" to describe the region. The slide deck calls Gulf Shores "[t]he epitome of 'Florabama'— mix of nice, relaxing Florida beaches with the down-home Southern vibe of Alabama."

Of the 300 people surveyed, about 34% had heard of the term "Flora-bama," with half of the 34% identifying it as the bar and the other half identifying it as the region. Defendants also engaged a market research company to learn more about "southern beach culture." The research suggested that the term

Flora-bama was "either unknown or though [sic] to refer strictly to the bar."

Ultimately, Defendants chose Panama City Beach as the filming location for the series. Panama City Beach is over 100 miles east of the Lounge, which is in Pensacola. McCarthy, after consulting Nina Diaz (MTV's head of unscripted television) and Viacom's legal department, decided to name the show *MTV Floribama Shore*.

Diaz testified that the creative process behind the decision to go with *MTV Floribama Shore* was driven by finding a title, like *Jersey Shore*, that would "define the subculture" featured in the series. McCarthy testified that "Floribama" offered "a very distinct sense of what part of the country and subculture that is." McCarthy also testified that because Florida has "multiple subcultures," a name like "Florida Shore" would not have sufficiently identified the Gulf Coast setting. And "Florida Shore," of course, would include Miami, which McCarthy noted "has its own sort of codes."

Defendants almost chose "Gulf Shore" as the name, but they ultimately wanted "a Jerseyesque type of show," and Diaz thought "Floribama" "scream[ed] louder" than "Gulf Shore." Diaz also thought "Gulf Shore" sounded in "style" and "tone" too much like another MTV series airing at the time called *Siesta Key*. Finally, Defendants added "MTV" to tie the series to the network and "Shore" to tie the series to the *Shore* franchise.

As Plaintiffs point out, Flora-Bama and the Lounge featured in many of Defendants' email exchanges. Jackie French, Viacom's executive producer of the series, emailed her team noting that the first episode "should tell the viewer what Floribama is, although the tricky thing is I'm not sure anyone actually calls it that. All my googling kept taking me to the Florabama bar." Another employee noted that "Google automatically assumes you mean [the F]lora[-B]ama [Lounge]."

### III.        2017 PREMIERE OF *MTV FLORIBAMA SHORE*

By October 2017, Defendants began marketing the series. The logo for the series was modeled after the *Jersey Shore* logo to convey its connection to the *Shore* franchise:



To compare, the following is Plaintiffs' trademarked logo:



Because "Floribama Shore" is not necessarily as geographically descriptive or widely known as "Jersey Shore," Defendants used graphics and scripted lines read by the cast to explain the meaning. In the premiere, the television series displayed its logo on top of a map of the South, and its cast read lines such as "That whole stretch of beach along the Gulf Coast from Alabama to Tallahassee—we call it Floribama"; and "THAT'S what it means to be from Floribama!" Notably, in an email instructing cast members to read the scripted lines, a 495 Productions executive wrote, "I know, I know . . . Floribama is just a bar. Ignore that part for now."

## IV.    PROCEDURAL HISTORY

### A.    Cease-and-desist Letter

*MTV Floribama Shore* was set to premiere on November 27, 2017, but on October 30, 2017, Plaintiffs sent Defendants a cease-and-desist letter claiming trademark infringement and asking Defendants to change the series name. Viacom refused and explained, "[T]itles of artistic works are entitled to substantial deference against Lanham Act and unfair competition claims." The series title remained.

*MTV Floribama Shore* premiered on schedule in November 2017. The second season aired from July 2018 to February 2019, and the series has aired four seasons in total.

## B.    Plaintiffs' Complaint

On August 6, 2019, after the second season aired, Plaintiffs sued, asserting eight claims: (1) trademark infringement under the Lanham Act § 32; (2) unfair competition under the Lanham Act § 43(a); (3) trademark infringement under Florida Statute § 495.131; (4) violation of the Florida Deceptive and Unfair Trade Practices Act under Florida Statute § 501.204; (5) trademark dilution under Florida Statute § 495.151; (6) Florida common-law trademark infringement; (7) Florida common-law unfair competition; and (8) Florida common-law unjust enrichment.

## C.    Summary Judgment and Plaintiffs' Evidence of Alleged Confusion

In April 2021, Defendants moved for summary judgment on all of Plaintiffs' claims.

In response, Plaintiffs maintained the series has caused confusion among their patrons that has damaged their brand. Plaintiffs submitted emails, letters, and declarations from their bartenders and regular musical acts stating that there have been multiple instances of confusion between the series and the Lounge. For example, a musician who often performed at the Lounge said multiple people asked her about the series "and if [she] had met any of the people on the television show." Several employees of the

Lounge claim they were repeatedly asked about the series, including when certain cast members would be around. An elderly patron criticized one of the Lounge's owners "for allowing MTV to air such a terrible depiction of the Flora-Bama."

Plaintiffs also submitted (1) a June 2017 RadarOnline article that used photos of the Lounge in its coverage of the series; and (2) social media posts that they contended showed the public's confusion between the two businesses. Plaintiffs now assert that "[t]his internet and social media confusion was fueled at least in part by Defendants' repeated use of 'Florabama'—Plaintiffs' exact trademark—by 495 Productions's President, Ms. Salsano, to promote the [series]." For example, a few days before the series premiered, Salsano posted on Twitter: "Yup one of a kind #Florabama @FloribamaShore @495Prods." Then on the night the series premiered, Salsano posted on Twitter: "[*Jersey Shore*'s] southern cousin is fun #MTV florabama shore."

Plaintiffs also offered two experts. Their social media expert, Jason McDonald, opined that from November 2017 forward, Internet searches for "Florabama" or "Flora-Bama" led to "blurred" results filled with *MTV Floribama Shore* content. And Professor David Franklyn conducted a survey and found that 22% of respondents were confused as to the sponsorship, approval, or affiliation between the Lounge and *MTV Floribama Shore*.

The district court granted summary judgment for Defendants. Plaintiffs timely appealed.

## D.    Plaintiffs' Appeal

On appeal, Plaintiffs' brief addresses their trademark infringement claims under the Lanham Act.  Thus, we focus our discussion on those claims.[2]

A group of sixteen intellectual property law professors and the Motion Picture Association, Inc. filed amicus briefs in support of Defendants and affirmance of the district court's grant of summary judgment to Defendants.

We review de novo a district court's decision to grant summary judgment, considering all the facts in the light most favorable to the nonmoving party.  *McClendon v. Long*, 22 F.4th 1330, 1336 (11th Cir. 2022).

## V.    GENERAL PRINCIPLES

## A.    Balancing Trademark and First Amendment Rights

This case highlights the interplay between the interests of the trademark owner and the consumer in avoiding confusion about the source or sponsorship of products and the First Amendment interests of the creator of the artistic work and the public in allowing freedom of expression and the free flow of ideas.

---

[2] The parties assume, as did the district court, that the Florida courts would adopt the same trademark principles as the federal courts in applying the Lanham Act.  So will we.  Thus, like the Plaintiffs, we will not discuss their state law claims separate from their Lanham Act trademark infringement claims.

21-13458                Opinion of the Court                15

As to trademarks, the Lanham Act "secure[s] to the owner of [a] mark the goodwill of his business" and "protect[s] the ability of consumers to distinguish among competing producers." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992) (internal quotation marks omitted).  The Lanham Act provides for civil liability when "[a]ny person who shall, without the consent of the registrant—use in commerce any reproduction . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion."  Lanham Act § 32(1)(a), 15 U.S.C. § 1114(1)(a).

On the other hand, the First Amendment ensures freedom of speech.  U.S. Const. amend. I.  The First Amendment's protections extend beyond written and spoken words.  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) ("[T]he Constitution looks beyond written or spoken words as mediums of expression.").  Creative works of artistic expression are firmly ensconced within the protections of the First Amendment.  *Id.* (stating that paintings, music, and poetry are "unquestionably shielded" by the First Amendment); *Kaplan v. California*, 413 U.S. 115, 119–20 (1973) ("[P]ictures, films, paintings, drawings, and engravings . . . have First Amendment protection . . . ."); *Buehrle v. City of Key West*, 813 F.3d 973, 975 (11th Cir. 2015) (holding that tattooing is artistic expression protected by the First Amendment).

The landmark case for balancing trademark and First Amendment rights is the Second Circuit's decision in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). More recently, our Court followed and adopted the Second Circuit's two-part test in *Rogers*. *See Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012). We start by reviewing those decisions.

### B.    *Rogers v. Grimaldi*

Ginger Rogers, an international celebrity, famously performed alongside Fred Astaire. *Rogers*, 875 F.2d at 996. They became known as the duo "Ginger and Fred." *Id.* Rogers asserted a Lanham Act claim against the producers and distributors of a film entitled *Ginger and Fred*. *Id.* at 996–97. The film told the story of two fictional Italian cabaret performers, Pippo and Amelia, who imitated Rogers and Astaire and thus became known in Italy as "Ginger and Fred." *Id.* The film was created and directed by the famed Italian filmmaker Federico Fellini. *Id.* at 996.

The Second Circuit recognized that the "First Amendment concerns do not insulate titles of artistic works from all Lanham Act claims," but they must inform the scope of the Act, as applied to claims involving titles. *Id.* at 998. The Second Circuit noted that while artistic works "deserve protection," they are "sold in the commercial marketplace," making consumer deception a legitimate concern. *Id.* at 997. While consumers have an interest in not being misled, they also have an interest in enjoying the results of the creator's or author's freedom of expression. *Id.* at 997–98.

The Second Circuit further noted that "[t]itles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion." *Id.* at 998. The "artistic and commercial elements of titles are inextricably intertwined." *Id.* Thus, the Second Circuit reasoned, "titles require[] more [First Amendment] protection than the labeling of ordinary commercial products." *Id.* The Second Circuit held that "[b]ecause overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the [Lanham] Act narrowly to avoid such a conflict." *Id.* The Second Circuit emphasized that "in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999.

After this background, the Second Circuit developed a two-part test that narrowly applies the Lanham Act in order to protect First Amendment interests in the titles of artistic works. The Second Circuit's two-part test provides that the title of an artistic work does not violate the Lanham Act "[(1)] unless the title has no artistic relevance to the underlying work whatsoever, or, [(2)] if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.*

Applying the two-part test to Rogers's claim, the Second Circuit affirmed the grant of summary judgment for the defendant's film's producers. *Id.* at 1001–02. On the first prong, the Second Circuit explained that the standard for artistic relevance

is an "appropriately low threshold of minimal artistic relevance." *Id.* at 999. It then found that the title of the film—*Ginger and Fred*—met the artistic relevance bar because the Italian characters were nicknamed Ginger and Fred, which was relevant to their story as Italian performers imitating the famous duo. *Id.* at 1001.

On the second prong, the Second Circuit concluded that while "some members of the public would draw the incorrect inference that Rogers had some involvement with the film," that confusion is "so outweighed by the interests in artistic expression as to preclude application of the Lanham Act." *Id.* And finally, even though "there [was] no doubt a risk that some people looking at the title *Ginger and Fred* might think the film was about Rogers and Astaire," the title is still "entirely truthful as to its content in referring to the film's fictional protagonists." *Id.* (cleaned up). The Second Circuit noted, "Rogers and Astaire are to [the film-maker] a glamorous and care-free symbol of what American cinema represented," and in that sense, the title was not misleading but "an integral element of the film and the film-maker's artistic expressions." *Id.* (internal quotation marks omitted).

Although not applicable to the facts of *Rogers*, the Second Circuit added a footnote containing an exception to the *Rogers* test. *See id.* at 999 n.5. That footnote stated: "[The *Rogers* test] would not apply to misleading titles that are confusingly similar to other titles [because t]he public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." *Id.* This footnote has become known

as the "confusingly similar titles" exception or the "title-versus-title" exception.

## C.    Courts' Adoption of the *Rogers* Test

Several circuits have adopted the Second Circuit's reasoning and two-part test in *Rogers*. *See, e.g.*, *Parks v. LaFace Recs.*, 329 F.3d 437, 450 (6th Cir. 2003); *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 902 (9th Cir. 2002); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 665 (5th Cir. 2000); *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996), *aff'd without opinion*, 156 F.3d 1225 (3d Cir. 1998). Additionally, the legislative history of the Lanham Act's latest amendment states that the *Rogers* test "appropriately recognizes the primacy of constitutional protections for free expression." H.R. Rep. No. 116-645, at 20 (2020).

To date, no circuit has explicitly adopted the exception in the *Rogers* footnote. One circuit has explicitly rejected it. *See Twentieth Century Fox Television v. Empire Dist. Inc.*, 875 F.3d 1192, 1197 (9th Cir. 2017) (explaining that the exception is "ill-advised or unnecessary").

## D.    Eleventh Circuit Precedent

Recently, this Court not only adopted the *Rogers* two-part test but also applied it to a trademark challenge to the content—as opposed to only the title—of an artistic work protected by the First Amendment. *See Univ. of Ala.*, 683 F.3d at 1278. In that case, the University of Alabama Board of Trustees brought a Lanham Act

suit against Daniel Moore, an artist who had painted famous football scenes involving the University's football team. *Id.* at 1269. Moore had reproduced his paintings as, among other things, prints and calendars. *Id.* The University argued that Moore's unlicensed paintings infringed on the University's trademarks because the depiction of the football uniforms "create[d] a likelihood of confusion on the part of buyers that the University sponsored or endorsed the product." *Id.* at 1275.

After recounting the facts in *Rogers*, this Court noted that other circuit courts have applied *Rogers* in "cases where trademark law is being used to attack the content—as opposed to the title—of works protected by the First Amendment." *Id.* at 1277; *see Cliff Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp.*, 886 F.2d 490 (2d Cir. 1989); *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915 (6th Cir. 2003).

This Court then adopted the two-part *Rogers* test: "An artistically expressive use of a trademark will not violate the Lanham Act [(1)] unless the use of the mark has no artistic relevance to the underlying work whatsoever, or, [(2)] if it has some artistic relevance, unless it explicitly misleads as to the source or the content of the work." *Univ. of Ala.*, 683 F.3d at 1278 (internal quotation marks omitted).

This Court "readily conclude[d] that Moore's paintings, prints, and calendars [were] protected under the *Rogers* test." *Id.* As to artistic relevance, we held that "[t]he depiction of the

University's uniforms in the context of these items" was "artistically relevant to the expressive underlying works because the uniforms' colors and designs are needed for a realistic portrayal of famous scenes from Alabama football history." *Id.* at 1278–79.

As to the explicitly misleading prong, we held there was "no evidence that Moore ever marketed an unlicensed item as 'endorsed' or 'sponsored' by the University, or otherwise specifically stated that such items were affiliated with the University." *Id.* at 1279. Though some members of the public may "draw the incorrect inference" that the University was in some way involved with Moore's works, that risk of misunderstanding was "so outweighed by the interests in artistic expression as to preclude any violation of the Lanham Act." *Id.* (cleaned up). We did not mention, much less apply, the confusingly similar titles exception from *Rogers*.

With this background, we turn to this case.

## VI.          APPLYING THE *ROGERS* TEST

### A.    Artistic Relevance

As already stated, under the first prong of the *Rogers* test, "[a]n artistically expressive use of a trademark will not violate the Lanham Act unless the use of the mark has no artistic relevance to the underlying work whatsoever." *Id.* at 1278 (internal quotation marks omitted).

To be artistically relevant, the relationship between the challenged title and the underlying work itself "merely must be

above zero." *E.S.S.*, 547 F.3d at 1100; *Rogers*, 875 F.2d at 999 (noting the standard for artistic relevance is an "appropriately low threshold of minimal artistic relevance").

*MTV Floribama Shore* clearly meets this first prong. The relationship between the series title and the series content itself is well above the artistic relevance threshold. "Floribama" describes the subculture profiled in the series and the geographic area exemplified by the subculture. To break it down even further, the former part of "Floribama," i.e., "Flori," refers to Florida and the beach culture the series sought to capture, while the latter part, i.e., "bama," refers to Alabama and the Southern culture the series sought to capture. As MTV's McCarthy explained, "Floribama" gave viewers "a very distinct sense of what part of the country and subculture" the series was about. Viacom also added its house mark (MTV) and the name of one of its iconic franchises (Shore) to the title. And voilà, *MTV Floribama Shore*.

Before moving on to the second prong, we address two of Plaintiffs' arguments on artistic relevance.

First, Plaintiffs contend that our precedent added a "necessary" component to the artistic relevance standard. They rely on part of *University of Alabama*, where we said Moore's depiction of the University's uniforms was "artistically relevant to the expressive underlying works because the uniforms' colors and designs [were] *needed* for a realistic portrayal of famous scenes from Alabama football history." *Univ. of Ala.*, 683 F.3d at 1278–79 (emphasis added).

Plaintiffs misunderstand our opinion. It is, of course, true that a title will be artistically relevant when it is necessary to use the title. But that does not mean a title must be strictly necessary to be artistically relevant. Nor does it mean that the use of a mark has artistic relevance only if its use carries the same meaning as the one the trademark holder gives it. As in this case, where the use of "Floribama" has artistic relevance to Defendants' show independent of referring to Plaintiffs' establishment, artistic relevance does not turn on whether the work is about the trademark or its holder.

As Defendants rightly explain, it would be improper for courts to decide what forms of expression are "necessary." In *University of Alabama*, for example, a court applying a necessity test would have had to decide, in effect, whether the artist *needed* to paint realistic uniforms or whether some lesser degree of realism would have sufficed. It is not our place to decide whether Defendants *needed* to use "Floribama" in their title. *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits."); *see also Parks*, 329 F.3d at 450 (rejecting an approach that "would needlessly entangle courts in the process of" deciding "whether a title is 'necessary' to communicate [an] idea"). It is enough that the title was relevant to the series Defendants sought to produce.

Second, Plaintiffs argue this case is similar to *Parks*. We disagree. In *Parks*, the Sixth Circuit held there was a genuine issue of material fact as to whether a song titled "Rosa Parks" had any artistic relevance to the content of the song. 329 F.3d at 454. The court reasoned that, despite the song's name, "[t]he composers did *not* intend [the song] to be about Rosa Parks, and the lyrics [were] *not* about Rosa Parks." *Id.* at 452. The court held that the case needed to go to a jury because it was "highly questionable" that the title had anything to do with the lyrics of the song at all. *Id.* at 459. Unlike in *Parks*, there is no doubt that the title *MTV Floribama Shore* is artistically relevant to the content of the series.

## B.    Explicitly Misleading

We proceed to the second prong—whether, although artistically relevant, the series title "explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. Consumer confusion fuels trademark law, and this prong targets that touchstone. The relevant question is whether (1) the secondary user overtly "marketed" the protected work "as 'endorsed' or 'sponsored'" by the primary user or (2) "otherwise explicitly stated" that the protected work was "affiliated" with the primary user. *See Univ. of Ala.*, 683 F.3d at 1279 ("[T]here is no evidence that Moore ever marketed an unlicensed item as 'endorsed' or 'sponsored' by the University, or otherwise explicitly stated that such items were affiliated with the University.").

Here, there is no evidence Defendants held the series out as endorsed or sponsored by Plaintiffs, nor did they explicitly state

that the series was affiliated with Plaintiffs. To the contrary, Viacom chose a title that includes its own house mark (MTV) and the name of one of its iconic franchises (Shore).

Plaintiffs' reliance on the survey data is unavailing. As explained above, of the 300 people surveyed, 34% had heard of the term "Flora-bama," with half of that 34% identifying it as the Lounge. We reject this evidence because any misunderstanding represented by the survey data was "not engendered by any overt claim." *Rogers*, 875 F.2d at 1001; *see also Univ. of Ala.*, 683 F.3d at 1279 ("Even if some members of the public would draw the incorrect inference that the University had some involvement with Moore's paintings, prints, and calendars, that risk of misunderstanding, not engendered by any overt or in this case even implicit claim, is so outweighed by the interest in artistic expression as to preclude any violation of the Lanham Act." (cleaned up)). The evidence must relate to the nature of the behavior of the defendant, not the impact of the defendant's use. *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1246 (9th Cir. 2013); *see also id.* at 1245 ("Adding survey evidence changes nothing.").

Twitter posts by Defendant 495 Productions's president, Salsano, are also insufficient to create a genuine issue of fact as to the explicitly misleading prong. Although Salsano used "#florabama" and "Florabama" in two tweets about the series, she did so in conjunction with references to Defendant 495 Productions and MTV. Such uses of Plaintiffs' spelling of the term rather than "Floribama" cannot be understood as misleading about

the source of Defendants' show because of Salsano's accompanying references to Defendants and their house mark.

Plaintiffs argue that because Defendants "deliberately copied" Plaintiffs' mark, the intent to misappropriate goodwill must be inferred. Plaintiffs appear to be arguing that intentional copying *alone* permits an inference of copying with intent to confuse. To support this argument, Plaintiffs rely on *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778 (11th Cir. 2020), a trade dress case involving product packaging for competing brands of adhesive.

But *J-B Weld* is a likelihood of confusion case that does not implicate the First Amendment. *J-B Weld* is thus inapplicable to First Amendment-Lanham Act cases such as this one.

Moreover, copying alone is not enough under *Rogers*. For example, in *Rogers*, filmmaker Federico Fellini intentionally copied the name to evoke the relationship between Fred and Ginger, and in *University of Alabama*, Moore intentionally made an almost exact copy of the University's trademarked uniforms. Yet both artists won. *See Rogers*, 875 F.2d at 1001–02; *Univ. of Ala.*, 683 F.3d at 1279.

To reiterate, the question as to the explicitly misleading prong of *Rogers* is whether (1) the secondary user overtly "marketed" the protected work "as 'endorsed' or 'sponsored'" by the primary user or (2) "otherwise explicitly stated" that the protected work was "affiliated" with the primary user. *Univ. of*

*Ala.*, 683 F.3d at 1279.   The question is *not* whether the artist intends to copy.

In sum, applying the *Rogers* two-part test, we conclude that Defendants' use of Floribama in its television series title—*MTV Floribama Shore*—did not violate the Lanham Act as a matter of law.

## VII.        EXCEPTION IN *ROGERS'* FOOTNOTE

Before concluding, we address Plaintiffs' argument that we should apply the exception to the *Rogers* two-part test found in the *Rogers* footnote.   The Second Circuit stated that the exception applies only when a defendant's title is "confusingly similar to other titles."   *Rogers*, 875 F.2d at 999 n.5.

To date, our Court has not adopted that exception in the *Rogers* footnote.   And we need not decide whether to do so here because this is not a title-versus-title case, and thus the exception has no application.

Here, *MTV Floribama Shore* is the title of an artistic work. However, Plaintiffs use Flora-Bama as a mark to identify their bar and other commercial enterprises—not to identify any artistic works created or owned by Plaintiffs.   Thus, this is not a title-versus-title case.

Nonetheless, Plaintiffs stress that third parties have used Flora-Bama in the titles of third parties' artistic works with Plaintiffs' oral or written permission.   That still does not make this

a title-versus-title case between the Plaintiffs and the Defendants. Basic trademark law demonstrates why.

"'Trademarks are 'any word, name, symbol, or device, or any combination thereof used to identify and distinguish one's goods from those manufactured or sold by others and to indicate the source of the goods.'" *Leigh v. Warner Bros.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (alterations adopted) (quoting 15 U.S.C. § 1127). In other words, "[t]he role that a designation must play to become a 'trademark' is to identify the source of one seller's goods and distinguish that source from other sources." 1 McCarthy on Trademarks and Unfair Competition § 3:1 (5th ed. updated Sept. 2022).

Telling here, third parties are not using Flora-Bama in their titles to their artistic works—songs, books, or a concert—to indicate their works are created, sung, or authored by the Plaintiffs. The titles are being used to identify what the song or the book is about, rather than who produced it. For example, the television program "Kenny Chesney Live at the Flora-Bama" describes the content of the broadcast (i.e., Kenny Chesney performing live at the Flora-Bama Lounge). Similarly, the title of the book *Food n' Fun at the Flora-Bama* describes the book's content (i.e., recipes by the owners, musicians, songwriters, bartenders, and others from the Lounge).

Simply put, the titles are not being used *as trademarks* to identify and distinguish the source of the artistic works. Plaintiffs have presented no evidence that any of these titles to the third

21-13458                Opinion of the Court                29

parties' artistic works have any source-identifying function. Because these titles are not being used as trademarks, this is not a title-versus-title case for purposes of the *Rogers* footnote.

Further, Plaintiffs have not provided any evidence that they own interests in those artistic works *as trademarks for Plaintiffs' own goods or services*—the foundation of trademark rights.[3]

Indeed, nothing in the record would allow a reasonable jury to conclude that the public views Plaintiffs as the source of these artistic works. Even one of Plaintiffs' principals, McInnis, understood that Plaintiffs did not stand behind Kenny Chesney's televised concert:

> [H]e asked permission to do it, and we told him it was fine. Because it -- specifically it wasn't the Flora-Bama -- I mean it wasn't Flora-Bama putting it out. It was him. It was his product. He plays at the Flora-Bama like he plays at a lot of the places. And he wanted to use "Live at the Flora-Bama." And we agreed to let him do that.

In other words, Plaintiffs understood what everyone else understood: it was Kenny Chesney's concert, not Plaintiffs'.

---

[3] Plaintiffs themselves appear to admit this: "The Flora-Bama Lounge and the 'Flora-Bama' trademark ha[ve] been celebrated and featured in the titles of various artistic works, including works in film, television, videos, radio, books, and song." At oral argument, Plaintiffs' counsel acknowledged that Plaintiffs do not own any interest in songs with Flora-Bama in the title.

Moreover, Plaintiffs' claims are premised on alleged confusion with Plaintiffs' commercial establishments, not with any artistic works purportedly owned by Plaintiffs. As Defendants note, Plaintiffs' complaint did not claim rights in or allege any confusion relating to any artistic work, and Plaintiffs' cease-and-desist letter did not mention any artistic works.

For all of these reasons, this is not a title-versus-title case between Plaintiffs and Defendants.[4]

## VIII.    CONCLUSION

We affirm the district court's grant of summary judgment to Defendants.

**AFFIRMED.**

---

[4] For completeness, we note that the district court applied the exception because Plaintiffs occasionally allowed third parties, like Kenny Chesney, to use "Flora-Bama" in the title to songs, books, and concerts. Still, the district court granted summary judgment to Defendants, finding that the First Amendment interests outweighed any likelihood of confusion.

Here though, we affirm the district court's grant of summary judgment based on the *Rogers* two-part test. *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) ("We may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below."). Further, nothing herein shall be construed as expressing any opinion as to whether we adopt or reject the confusingly similar titles exception.

BRASHER, Circuit Judge, concurring:

I agree with the Court's analysis and join its opinion. I write separately to answer a question of first impression that the Court declines to address: whether this Court should adopt an exception to the *Rogers* defense for confusingly similar titles of artistic works. *See* Op. § VII. I believe we should not. So, in an appropriate case that squarely presented the question, I would vote to reject this so-called exception.

As the Court's opinion explains, the Second Circuit in *Rogers* recognized a First-Amendment-based defense to Lanham Act liability for artistic works. *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989). The court reasoned that, under the First Amendment, the Lanham Act could constitutionally "apply to artistic works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression." *Id.* Balancing those interests, the court held that there can be no Lanham Act liability when an artistic work uses a trademark unless the use of the mark (1) has no artistic relevance to the work or (2) explicitly misleads as to the work's source or content. *Id.* We endorsed the *Rogers* test in *University of Alabama Board of Trustees* v. *New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012). And I agree with the Court that *Rogers* provides a defense on the facts of this case. *See* Op. § VI.

But, in dicta in a footnote in *Rogers*, the Second Circuit suggested that the defense might not extend to "misleading titles that are confusingly similar to other titles" of artistic works. 875 F.2d at

999 n.5. This footnote has spawned something called the title-versus-title exception to the *Rogers* defense. Although most circuits have adopted *Rogers*, no circuit has adopted or applied this exception to *Rogers*. *See* Op. § V.C. The Ninth Circuit is the only circuit to have squarely addressed whether this exception exists, and it has held that it does not. *See Twentieth Century Fox Television v. Empire Dist. Inc.*, 875 F.3d 1192, 1196-97 (9th Cir. 2017) (reasoning that the exception is "ill-advised or unnecessary" because it "has the potential to duplicate" the test for Lanham Act liability and the second prong of the *Rogers* test).

In an appropriate case, I believe this Court should join the Ninth Circuit in rejecting the title-versus-title exception to the *Rogers* defense. This is so for two overarching reasons. First, I think the title-versus-title exception is inconsistent with the First Amendment values that led us to adopt the *Rogers* defense. Second, even if the exception were appropriate under the First Amendment, I think the title-versus-title exception is impractical as a matter of doctrine because it is hard to apply in a consistent and logical way. I'll briefly address each reason in turn.

I.

As an initial matter, I believe the title-versus-title exception is incompatible with the First Amendment principles that justify the *Rogers* defense. To be clear, this exception would give the first person who uses a mark in a title to an artistic work a monopoly over the use of that mark in the titles to other artistic works. Why

should the law treat "confusingly similar titles" of artistic works differently than other equally confusing uses of trademarks in artistic works? I can think of three possible justifications, but none bear up under scrutiny.

First, one could argue that *titles* don't warrant the same degree of First Amendment protection as the other parts of an artistic work. But that doesn't make any sense. The title of an artistic work is almost always itself artistic because it conveys an idea or point of view about the work. *See Punchbowl, Inc. v. AJ Press, LLC*, ___ F.4th ___, 2022 WL 16911996 at *4 (9th Cir. 2022). And the *Rogers* court acknowledged that trademark law usually gives "greater leeway for the use of titles than for names of ordinary commercial products, thus allowing breathing space for free expression." 875 F.2d at 998 n.3. Accordingly, it makes little sense to establish an exception to *Rogers*'s First Amendment protections in cases involving titles—an area where First Amendment protection should arguably be higher, not lower. At a minimum, there is nothing about titles that reduces the weight of the First Amendment interests against Lanham Act liability identified in *Rogers*.

Second, one could argue that the First Amendment calculus is different when two *artists* use the same title because both the plaintiff and defendant are engaged in artistic expression. Most *Rogers* cases, like this one, involve a commercial trademark and the use of that mark in artistic expression. But a true title-versus-title dispute occurs between two parties who are both engaged in artistic expression and use the same or similar title for their works.

The implicit idea behind the *Rogers* footnote may be that, in a true title-versus-title dispute, both the plaintiff and the defendant have a First Amendment interest on their side.

Ultimately, I don't think this argument—that both parties are engaged in artistic expression—warrants an exception to *Rogers*. The First Amendment promotes and protects a "marketplace of ideas." *See Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) (quotation marks omitted) (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015)). But liability under the Lanham Act gives priority in the marketplace of ideas to whoever speaks first and silences the speech of the second speaker. As the *Rogers* court made clear, this result is hard to square with the First Amendment when the second speaker's use is artistic and not expressly misleading.

This First Amendment calculus doesn't change just because both the first and second speakers are engaged in artistic expression. Even if both parties are using a trademark in the title of an artistic work, the First-Amendment question is the same: should the court invoke the Lanham Act to silence the second speaker's speech? And the answer should be the same as well. "The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (cleaned up) (quoting *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)). Absent a neutral time, place, or manner restriction, one person's right to speak cannot justify silencing a

second person's speech. Another way to say it: no one has a First Amendment right to stop someone else from speaking.

Consider the following illustration of how the title-versus-title exception can stifle artistic speech and discriminate on viewpoint. A company uses its trademark as the title of a documentary about its business, which casts the business in a flattering light. If someone later produces a documentary that casts the company in an unfavorable light, the company could wield its trademark and the title-versus-title exception to require that the second documentary not use the company's mark in its title. The result is that the company's favorable documentary would have an advantage in the marketplace of ideas over the critical documentary—only the company's documentary would be able to identify itself by using the mark. Under the First Amendment, the government has no business promoting the first documentary over the second. It simply doesn't matter that the favorable documentary is also an artistic work.

The third, and perhaps best, justification for the title-versus-title exception is that the public has an interest in preventing confusion as between the sources of two artistic works. If two movies are running at the same time at the same theater with the same title, it could be impossible for moviegoers to identify the movie they want to see. So one could argue that the law should not protect confusingly similar titles to artistic works.

This justification has some intuitive appeal. As early as medieval times, trademarks served as a method of tracing a good to

its source. Per guild requirements, medieval craftsman placed marks on their goods "to facilitate the tracing of 'false' or defective wares." F. Schechter, *The Historical Foundations of the Law Relating to Trade-marks* 47 (1925). Source identification remained at the forefront as trademark law evolved from guild regulations to part of the common law of England. *See* Keith M. Stolte, *How Early Did Anglo-American Trademark Law Begin? An Answer to Schechter's Conundrum*, 8 Fordham Intell. Prop. Media & Ent. L.J. 505, 506, 533 (2006); 1 McCarthy on Trademarks and Unfair Competition § 5:2 (5th ed. updated Sept. 2022). And solving this problem is the very reason the Lanham Act exists: "'to protect the ability of consumers to distinguish among competing producers.'" *Two Pesos, Inc., v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992) (quoting *Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985)).

But, although this justification has some appeal, the *Rogers* defense itself solves this problem. By its terms, *Rogers* does not extend its First Amendment protections to parts of artistic works—whether titles or not—that "explicitly mislead" as to their source or content. 875 F.2d at 999. In this respect, the *Rogers* defense is already consistent with the historical and traditional goals of trademark law. There is no need for a separate exception that applies to "confusingly similar" titles alone.

One could argue that the courts have an interest in stopping artists from using "confusingly similar" titles even if those titles don't "explicitly mislead." But there are two problems with that argument. First, to the extent the title-versus-title exception is

directed at the difference between "explicitly mislead" and "confusingly similar," it strays from the core historical justification of trademark law, which is identifying the source of a good. For this reason, removing *Rogers*'s protection from titles that are confusingly similar but not explicitly misleading raises serious First Amendment concerns. *Cf. N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 (2022) (holding that historical regulation delineates the outer bounds of permissible regulation under the Second Amendment). Second, the problem of "confusingly similar" uses of a mark is not specific to titles. If the First Amendment allows a musician to use lyrics that fail the "confusingly similar" test but pass the "explicitly mislead" test, why not a title? This interest, to the extent it is one, does not justify a different rule for titles than all other parts of an artistic work.

In short, adopting the title-versus-title exception would expressly reduce *Rogers*'s protection for free expression and raise the very First Amendment problems that led the *Rogers* court to adopt a defense in the first place. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* § 38 at 247-48 (2012) ("[The constitutional-doubt canon] militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality."). I don't see any justification for giving the titles of artistic works less protection than anything else in an artistic work. So, for the same reasons we have adopted the *Rogers* defense, I think we should reject the title-versus-title exception to it.

## II.

But even if the title-versus-title exception could be justified as a matter of principle, I would reject it as a matter of practicality. The facts and procedural history of this case convince me that it is not a workable test to apply. It is exceedingly difficult to figure out what counts as a title-versus-title dispute and, even when the exception has some application, it seems just to mirror the test for Lanham Act liability.

For starters, there is no easy way to identify what counts as a title-versus-title dispute. Here, the Court quickly concludes that this dispute does not implicate the title-versus-title exception because, although third parties have used the "Flora-Bama" trademark as the title of artistic works such as music and books, the plaintiffs have not. I agree with that reasoning.

But it's not hard to imagine a scenario in which the question is much more difficult. Famous trademark holders use their marks to brand and market all sorts of goods—some of which are artistic in nature. *Compare, e.g.*, Magnolia Table (a restaurant) at https://magnolia.com/visit/eat/magnolia-table/ (last visited Nov. 23, 2022) *with* Magnolia Table (a TV show) at https://magnolia.com/watch/ (last visited Nov. 23, 2022). Because marks are often used for multiple purposes, it's entirely unclear how a court should go about deciding whether a mark is a title to an artistic work for the purposes of applying the title-versus-title exception. If Starbucks uses its mark as the title to a music album that it sells in

its coffee shops, does a dispute about a book or documentary with "Starbucks" in the title fall under a title-versus-title exception? A broad understanding of title-versus-title would give trademark holders a powerful a tool to stifle expression by merely placing their mark in the title of an artistic work that they endorse. That doesn't seem right.

So, perhaps, the title-versus-title exception is implicated only when the primary purpose of a trademark is to identify the source of an artistic work. But, if that's the case, how are courts to decide what the primary purpose of a trademark is? Does it matter if the first use of the title was in a movie and the second use was in a book? Does it matter which use of the mark is more famous? If a commercial establishment airs a TV show about itself, and the TV show's fame rivals that of the establishment, would the title-versus-title exception then apply to an unauthorized book or documentary that used the establishment's name in its title? Who knows.

To be sure, the law can bear a little indeterminacy. But we should not expect a judicially created defense to be so complicated that a court needs extensive fact-finding just to determine if an exception to that defense is implicated. And certainty is especially important in an area like this one where even the prospect of liability has the effect of chilling constitutionally protected speech. *See* Glynn Lunney, *Trademark's Judicial De-Evolution: Why Courts Get Trademark Cases Wrong Repeatedly*, 106 Calif. L. Rev. 1195, 1201 (2018).

On top of this indeterminacy problem, there is the added problem that the title-versus-title exception—even where it clearly applies—merely duplicates other aspects of the test for Lanham Act liability. *See Empire*, 875 F.3d at 1197. The title-versus-title exception to the *Rogers* defense asks whether a title is "confusingly similar" to another title. But, as explained above, the *Rogers* test itself asks whether the artistic use of a trademark "explicitly misleads as to the source or content of the work." And liability under the Lanham Act turns on a seven-factor likelihood-of-confusion test that asks whether the defendant "adopted a mark or name that was the same, or *confusingly similar* to [the plaintiff's] mark." *Tana v. Dantanna's*, 611 F.3d 767, 773-75 (11th Cir. 2010) (emphasis added).

Here, as the Court notes in footnote 4, the district court applied the title-to-title exception. But, in doing so, it simply followed the test for liability under the Lanham Act, asking whether the two marks are confusingly similar under our seven-part likelihood-of-confusion test. I don't fault the district court for its efforts to make sense of the title-versus-title exception. But the problem with this analysis is obvious. It cannot be that a defense against Lanham Act liability fails simply because a defendant would otherwise be liable under the Lanham Act. If proving a defense requires disproving liability, it is no defense at all.

### III.

The bottom line is that we should not adopt the title-versus-title exception to the *Rogers* test. That exception is inconsistent

21-13458             BRASHER, J., Concurring                    41

with First Amendment principles, and it is difficult to apply in any logical way. Accordingly, in an appropriate case in which this issue is dispositive, this Court should join the Ninth Circuit in rejecting the title-versus-title exception to *Rogers*.